# EXHIBIT "C"

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF HAWAII

3

4        JEANNETTE MILLER,                    )

5                                             )

6                          Plaintiff,         )

7                                             )

8                                             )

9             vs.                             ) Civil No.

10                                            ) 04-00441BMK

11      MAUI OCEAN ACTIVITIES, INC.,  ) (Admiralty)

12      ("MOA"), THEODORE C. KING,            )

13      BETH D. KING, In Personam and )

14      MOA VESSEL, In Rem,                   )

15                                            )

16                          Defendants. )

17      _____)

18

19             VIDEOTAPED DEPOSITION OF DOUGLASS RIDEOUT,

20      Taken on behalf of Defendants Maui Ocean Activities, Inc.

21      ("MOA"), Theodore C. King, Beth D. King, and MOA Vessel,

22      at 75-170 Hualalai Road, Suite D-212, Kailua-Kona, Hawaii

23      96740 commencing at 9:29 a.m., on June 27, 2006, pursuant

24      to Notice.

25

**EXHIBIT "C"**

Page 2

1  BEFORE:  SHIRLEY L. KEYS, RPR, CM, CSR 383
2       Notary Public, State of Hawaii
3
4
5  APPEARANCES:
6
7  For Plaintiff    HOWARD G. MCPHERSON, ESQ.
8  Jeannette Miller:  600 Davies Pacific Center
9           841 Bishop Street
10          Honolulu, Hawaii  96813
11
12 For Defendants    JOHN O'KANE, JR., ESQ.
13 Maui Ocean       Frame Formby & O'Kane
14 Activities, Inc.   Four Waterfront Plaza, Suite 575
15 ("MOA"), Theodore  500 Ala Moana Boulevard
16 C. King, Beth D.   Honolulu, Hawaii  96813
17 King, and MOA
18 Vessel:
19
20 The Video       ROBERT WHITMAN, ESQ.
21 Specialist:      Certified Legal Video Services
22           1111 Bishop Street, Suite 500
23           Honolulu, Hawaii  96813
24
25

Page 3

1             I N D E X
2
3
4
5  EXAMINATION BY:              PAGE
6    Mr. McPherson         4, 78
7    Mr. O'Kane            73
8
9  EXHIBITS FOR IDENTIFICATION     PAGE
10 1 Handwritten Statement, two pages    13
11 2 Transcript              14
12 3 Chart                 36
13 4 Drawing               52
14 5 DVD                  79
15
16
17
18
19
20
21
22
23
24
25

Page 4

1       (Disclosure presented to counsel.)
2       THE VIDEO SPECIALIST:  This is the
3  deposition of Douglass Rideout in the matter of Jeannette
4  Miller versus Maui Ocean Activities, Inc., et al.  We are
5  located at the offices of Ralph Rosenberg Court Reporters
6  in Kailua-Kona on the island of Hawaii, State of Hawaii.
7  My name is Robert Whitman, certified legal video
8  specialist.  Will counsel please state their names?
9       MR. MCPHERSON:  Howard McPherson for
10 plaintiff Jeannette Miller.
11       MR. O'KANE:  And John O'Kane for Maui
12 Ocean Activities and the other defendants.
13       THE VIDEO SPECIALIST:  Today is June 27
14 in the year 2006 and we are on the record at 9:29 a.m.
15 Would the court reporter please swear in the deponent?
16       DOUGLASS RIDEOUT,
17 called as a witness at the instance of Defendants Maui
18 Ocean Activities, Inc. ("MOA"), Theodore C. King, Beth
19 D. King, and MOA Vessel, being first duly sworn to tell
20 the truth, the whole truth and nothing but the truth, was
21 examined and deposed as follows:
22
23          E X A M I N A T I O N
24 BY MR. MCPHERSON:
25   Q.  State your full name for the record, please.

Page 5

1   A.  Douglass Maas Rideout.
2   Q.  Are you a Coast Guard licensed captain?
3   A.  I have been.
4   Q.  You have been?  Is it all right if I refer to
5  you as Captain Rideout then?
6   A.  Sure.  That's fine.
7   Q.  Captain Rideout, I'm Howard McPherson.  We were
8  briefly introduced off the record informally.  I
9  represent Jeannette Miller in -- in this case, and it
10 concerns an accident that happened to her at the
11 Kailua-Kona boat -- boat launching ramp.  Have you
12 testified in a deposition before?
13   A.  I have.
14   Q.  On how many occasions?
15   A.  One occasion.
16   Q.  Pardon?
17   A.  One occasion.
18   Q.  How long ago was that?
19   A.  A long time ago.
20   Q.  What kind of --
21   A.  I can't remember.  It was a traffic.
22   Q.  Was a traffic case?
23   A.  Yeah.
24   Q.  Okay.  I'm going to go over the -- the way the
25 process works with you a little bit to start with to make

Page 6

1  sure it's clear and easier for you.  First, a couple of
2  practical things.  I wait for you, you wait for me
3  speaking, that makes the job of the court reporter much
4  easier, okay?
5     A.   Uh huh.
6     Q.   You need to also answer verbally with words as
7  opposed to sounds or gestures, please.
8     A.   Yes.
9     Q.   We'll remind you.
10    A.   Okay.
11    Q.   Very important that you be sure you understand
12  any question that's asked of you today, because if you
13  respond to a question, everyone involved in the case is
14  going to assume that you understood it.  With me so far?
15    A.   Yes.
16    Q.   Okay.  Is that fair?
17    A.   Yes.
18    Q.   Okay.  So please don't be shy if you don't hear
19  part of it or you don't understand part of it or all of
20  it, just speak up and let us know and we'll try to fix
21  it, all right?
22    A.   Yes.
23    Q.   There may be times when you're asked a question
24  for which you can't give a precise answer but you can
25  give an approximation or an estimate, and we ask you to

Page 7

1  do that, all right?
2     A.   Yes.
3     Q.   Okay.  The difference being something like we
4  asked you how far is it to drive from here to Kawaihae,
5  presumably you -- you could give an estimate.  If I asked
6  you my brother-in-law's middle name, you haven't a clue,
7  you just say I don't know.  All right?
8     A.   Right.
9     Q.   Okay.  So again, please don't be shy.  If it's
10  something that you don't know, please do not feel
11  compelled to make assumptions or deductions in your own
12  mind thinking that you have to address the question
13  substantively.  If you don't know, it's perfectly fine to
14  just tell us that, okay?
15    A.   Okay.
16    Q.   Similarly, something that you once knew but
17  you've now forgotten, you must feel free to tell us you
18  don't recall.  However, as with estimates, if you have a
19  partial recollection or hazy recollection, we do ask that
20  you give us that as best you can and then we'll make what
21  use of that information we can in the case, okay?
22    A.   Right.
23    Q.   The -- the oath that you gave at the beginning
24  of the proceeding, it's important that you understand
25  carries the same obligations of truthfulness, carries the

Page 8

1  same penalties of perjury as if you were testifying in a
2  courtroom.  Do you understand?
3     A.   Yes.
4     Q.   At the end of the deposition, the court
5  reporter is going to prepare your testimony in the form
6  of a little booklet we call a transcript.  And as a
7  witness you have an absolute right to review that, that
8  product of hers, that transcript and -- and correct it
9  for -- for both -- both simple errors like typographical
10  errors and for substance, but you need to know that if
11  you change your answer substantively at the time you
12  review the transcript, for example, you change a yes to a
13  no, that can have an adverse impact on the way your
14  testimony's received in the case.  Do you understand?
15    A.   Yes.
16    Q.   So please do take your time.  It -- it's
17  important that you try to give your -- your best and most
18  accurate testimony today, all right?
19    A.   Yes.
20    Q.   Have you taken any medications or is there any
21  other reason that you know of by which you might be
22  impaired in your ability to understand and respond to
23  questions?
24    A.   No.
25    Q.   Good.  Did you make -- did you review any

Page 9

1  documents in preparing to testify this morning?
2     A.   I looked at my statements that I previously
3  made and then the transcript of my video.
4     Q.   Okay.  I gather the transcript must have been
5  provided to you by Mr. O'Kane?
6     A.   Yes.
7     Q.   Since I provided it to him yesterday?  All
8  right.  Before we get into that, is Mr. O'Kane
9  representing you personally?
10    A.   He is representing me, yes.
11    Q.   Okay.  Was it his idea that he represent you or
12  your idea?
13         MR. O'KANE:  Absolutely do not answer
14  that question.  That is absolutely none of your business
15  one way or the other.  It's attorney-client privilege.
16  I'm instructing you not to answer.  Do -- can you follow
17  my instructions?
18    A.   I will follow your instruction.
19    Q.   (By Mr. McPherson)  When did Mr. O'Kane become
20  your attorney personally?
21    A.   He became my attorney today.
22    Q.   This morning?
23    A.   This morning.
24    Q.   Are you paying him for his services?
25    A.   No, I'm not.

Page 10

1    Q.    Any particular reason that you felt you need to
2  be represented by an attorney this morning?
3        MR. O'KANE:  Well, other than the fact
4  that he's a captain and can bind the corporation?  Is
5  that -- is that your question?
6        MR. MCPHERSON:  I'm asking him.
7    A.    Is there any particular reason?
8        MR. O'KANE:  That's --
9    A.    It seemed like it was a good idea.
10   Q.    (By Mr. McPherson)  It seemed like it was a
11  good idea?
12   A.    Yeah.
13   Q.    Is that about it then?
14   A.    Yes.
15   Q.    Other than speaking with Mr. O'Kane and
16  preparing to testify, did you speak with anyone else?
17   A.    I spoke with Mark a couple minutes ago.
18   Q.    Mark Hamilton?
19   A.    Mark Hamilton, yes.
20   Q.    Was -- was that in preparation for today's
21  testimony?
22   A.    That was not in preparation for this.  I don't
23  think this was even set up then.  This was -- I was just
24  talking about the case, about what I had -- about the
25  video and what I'd seen.

Page 11

1    Q.    Were you represented by an attorney at that
2  time?
3    A.    No, I was not.
4    Q.    Okay.  Do you recall what you discussed about
5  the case at that time?
6    A.    I can't recall.  We had lunch and just talked
7  about the case.
8    Q.    Can't remember a thing about it?
9    A.    Probably similar stuff that we're going to go
10  over.  I just -- he asked me a few questions, I told him,
11  answered him what I knew.
12   Q.    Do you remember what any of the questions were?
13   A.    No.
14   Q.    How long ago was that?
15   A.    About two months ago.
16   Q.    In Honolulu?
17   A.    No, that was at the Harbor House in Kailua.
18   Q.    Kailua-Kona?
19   A.    Kailua-Kona, yes.
20   Q.    Other than Mr. Hamilton and Mr. O'Kane, have
21  you discussed the case with anyone?
22   A.    No.
23   Q.    Ted King?
24'  A.    Huh?
25   Q.    Ted King?

Page 12

1    A.    Oh, Ted King?  Not really any -- much details,
2  maybe on the phone, right -- right when it first happened
3  I discussed the incident with him.  But lately here in
4  preparation for this deposition, no.
5    Q.    Okay.  Do you remember what you talked with him
6  about the incident?
7    A.    I don't know.  I wrote him up the paper there
8  that you have and told about -- about what had happened
9  and I can't remember.  I mean that was a long time back.
10  What our exact conversation was I can't remember, but I
11  know that we were -- we worked together, I mean I worked
12  for him, I -- we were in communication and then we had an
13  incident, so we talked about that.
14   Q.    So you spoke with him about the accident soon
15  after it happened?
16   A.    Yes.
17   Q.    Okay.  Let -- let me show you a -- a document
18  with some handwriting on there.  Let me ask you first of
19  all to take a look at it and then I'm going to ask you
20  you've had a chance to look at it whether that's
21  the writeup you just referred to.
22   A.    Yes, that is.
23   Q.    Okay.  Do you recognize your own handwriting on
24  this?
25   A.    Yes, I do.

Page 13

1    Q.    Okay.  We're -- we're going to mark it as
2  Exhibit 1 for housekeeping purposes.
3    A.    Okay.
4    Q.    The court reporter will do that if you hand
5  that over to her, please.
6        (Handwritten Statement, two pages,
7  marked Exhibit 1.)
8    Q.    (By Mr. McPherson)  We'll -- we'll come back to
9  the Exhibit 1 --
10   A.    Okay.
11   Q.    -- after a little while.
12   A.    Okay.
13   Q.    You review -- was this the statement that you
14  referred to earlier that you referred -- you reviewed in
15  preparing to testify today?
16   A.    This morning, yes.
17   Q.    Okay.  And then the transcript of the video
18  clip?
19   A.    Correct.
20   Q.    All right.  Let me hand you what I think you're
21  referring to as the transcript of the video clip and ask
22  you to take a look at it and see if you can identify it
23  as such, please.
24   A.    This was what I read this morning.
25   Q.    Okay.  So that's the second document you were

1   referring to?

2      A.   Yes.

3      Q.   We'll go ahead and mark that as Exhibit 2 for

4   the record.  If you'll hand that to the court reporter,

5   please.

6           (Transcript marked Exhibit 2.)

7      Q.   (By Mr. McPherson)  Captain Rideout, any other

8   documents that you reviewed in preparing for testifying

9   today?

10     A.   Not that I can think of.

11     Q.   Okay.  Have you seen any other documents

12  pertaining to this case at any other time?

13     A.   No.

14     Q.   Other than the deposition notice I sent you a

15  copy of?

16     A.   Right.

17     Q.   Any -- any other communications regarding the

18  case in writing that you can recall?

19     A.   No.  Not that I can recall.

20     Q.   Okay.  Let me -- well, before we move to the

21  next subject, anything else you did to prepare to testify

22  today, Captain Rideout, other than what we've discussed,

23  talking with Mr. O'Kane and reviewing these two documents

24  we've marked as Exhibits 1 and 2?

25     A.   No.  I haven't prepared at all.

1      Q.   Let -- let me ask you a little bit about your

2   personal background.  Place and date of birth, please?

3      A.   San Jose, California.  January 14, 1945.

4      Q.   Make you 61 today?

5      A.   Yes, I am.

6      Q.   Did you go to high school in California?

7      A.   I did.

8      Q.   What year did you graduate?

9      A.   '63.

10     Q.   Any college?

11     A.   Yes.

12     Q.   What college have you had?

13     A.   I went for a couple of years to Cabriello

14  College.

15     Q.   Cabriello?

16     A.   Cabriello, and then I went for awhile over in

17  Hilo.

18     Q.   University of Hawaii at Hilo?

19     A.   No, the community college.

20     Q.   Hilo Community College.  Any degrees or

21  certificates from either Cabriello or HCC?

22     A.   No.

23     Q.   Any particular major course of study that you

24  started out in?

25     A.   Not particularly.

1      Q.   And earlier you shared with us that you were at

2   one time licensed Coast Guard captain, is that correct?

3      A.   That's correct.

4      Q.   During what years were you licensed?

5      A.   I was licensed for 16 years.

6      Q.   From when to when, approximately?

7      A.   From -- let's see.  '80 -- '88 or '89, '88, I

8   guess, through -- I let my license go a few years ago.

9      Q.   You decided not to renew it at some point?

10     A.   Yes.

11     Q.   A few years ago?

12     A.   Yes.

13     Q.   The accident that's the subject of this case

14  was in August of 2003.  Was your license still in effect

15  at that time?

16     A.   Yes, it was.

17     Q.   So you let it -- or you decided not to renew it

18  sometime after this accident?

19     A.   Yes.

20     Q.   Any particular reason you decided not to renew

21  it?

22     A.   I -- I was ill and I had to do some treatments

23  and I didn't want to be involved in it at that time.

24     Q.   Oh, I see.  Have you any plans to renew it in

25  the future?

1      A.   No.  I'm not going to go to sea anymore.

2      Q.   For health reasons you gave it up?

3      A.   Yes.

4      Q.   Do you recall approximately when you stopped

5   sailing under your license?

6      A.   Probably would have been within a year of when

7   the accident was.

8      Q.   Sometime in 2004, you think?

9      A.   Yes.

10     Q.   What tonnage did your license --

11     A.   I had a 100 ton license.

12     Q.   At the time you stopped?

13     A.   Yes.

14     Q.   Any other endorsements, geographical

15  endorsements?

16     A.   I had a sailing endorsement.

17     Q.   Geographic limits?

18     A.   Coastal.

19     Q.   Did you have this same license in effect in

20  2003?

21     A.   Yes, I did.

22     Q.   Did it license you to operate passenger

23  vessels?

24     A.   Oh, yes.

25     Q.   Up to 100 ton?

Page 18

1    A.    Up to 100 tons.
2    Q.    Have you had any other formal education or
3  training other than the high school, college and Coast
4  Guard licensing?
5    A.    Yeah, Pacific Maritime Academy to get my Coast
6  Guard license.  That would be all the formal education.
7    Q.    No real estate or other --
8    A.    No.
9    Q.    -- licensing?
10   A.    No.
11   Q.    Where's the Pacific Maritime Academy?
12   A.    It -- they -- they are in Honolulu.  They used
13  come here every year to give classes here.
14   Q.    And you studied with them in the late '80s?
15   A.    Yes.
16   Q.    Did you ever have any proceedings or complaints
17  against your Coast Guard license?
18   A.    No.
19   Q.    When did you first work with Maui Ocean
20  Activities and/or Aloha Jet Ski?
21   A.    I'm not sure of the exact date.  Probably I'd
22  been working for Aloha for -- I would just hazard a guess
23  of eight months or so before this incident.
24   Q.    Okay.  So our understanding is it happened in
25  August of '03, so you think you began somewhere around

Page 19

1  the turn of 2002, 2003?
2    A.    I would guess, yes.
3    Q.    Okay.
4          MR. O'KANE:  That's -- that's a
5  reasonable estimate, is that correct?
6    A.    Yes.
7    Q.    (By Mr. McPherson)  Best recollection, in other
8  words?
9    A.    Best recollection, yeah.
10   Q.    All right.  How long have you lived on the Big
11  Island?
12   A.    I moved to the Big Island in 1974.
13   Q.    Okay.  When did you stop working for Maui Ocean
14  Activities and/or Aloha Jet Skis, best of your
15  recollection?
16   A.    Best of my recollection would be within three
17  or four months of this incident.
18   Q.    Okay.  Again, if this happened in August of '03
19  then --
20   A.    So I would say before the end of the year.  I
21  worked -- probably worked for them for less than a year.
22   Q.    Is it your understanding that Aloha Jet Skis
23  and Maui Ocean Activities are the same company or
24  different company?
25   A.    I thought the same.

Page 20

1    Q.    Okay.  And the owners are Mr. and Mrs. King, is
2  that correct?
3    A.    Right.
4    Q.    Any other owners that you know of?
5    A.    I do not know of any others.
6    Q.    Okay, and that's Ted and Beth King?
7    A.    I've only met Ted.
8    Q.    What does Aloha Jet Ski charge -- well, strike
9  that.  At the time you worked for the company, what did
10  they charge for an hour rental of a jet ski?
11   A.    Oh, let me see.  They had a kamaaina price and
12  a tourist price that were different, and I believe the
13  kamaaina price was $40 an hour and the tourist price was
14  around 60, I think.  That's just my best guess.
15   Q.    Okay.  Do you recall Jeannette Miller, working
16  with her?
17   A.    I do.
18   Q.    Was she a good worker?
19   A.    I hardly got a chance to know her.  She was
20  only there for a short time, but I liked her, she was
21  enthusiastic, I liked her.  She was a nice person.
22   Q.    Honest person, as far as you knew?
23   A.    As far as I knew.
24   Q.    And our best understanding so far in the case
25  is that she worked for the company Aloha Jet Skis/Maui

Page 21

1  Ocean Activities for about a time period of late July to
2  the day of the accident in August of '03.  Does that --
3  is that consistent with your memory?
4    A.    I can't remember the times there.  I'd have to
5  go by what you guys say.
6    Q.    You just remember she was there a short while?
7    A.    A short while, yes.
8    Q.    Okay.  And did she have a job description when
9  you worked with her?
10   A.    Yeah.  Her job was to -- to -- was to greet
11  people who -- the way the operation worked --
12   Q.    Let me ask you first did she have a title?
13   A.    Oh, not -- not a title, but I -- I can't think
14  of a title, what -- what her title would be.  It would be
15  a greeter perhaps.
16   Q.    Okay.  What was the description of her job as
17  you -- as you knew it?
18   A.    I would operate the shuttle boat and we had an --
19  our office on the pier is the back of the pickup truck
20  since we can't have an office there, they let us have
21  people come to the pickup truck to -- to hook up, to --
22  to go on their -- to go on their jet ski ride.  And
23  because I'm operating the boat and taking people out back
24  and forth to the platform, I'm not at the truck
25  sometimes.  On days when we weren't very busy we would

Page 22

1  just hang a sign on the truck and it would tell people
2  that I would be back in a few minutes and just to wait.
3  But on days when it was busy, we had somebody who worked --
4  a girl usually who worked there who was a very kind of
5  casual job because a lot of times you're just reading the
6  paper or your book or doing your homework or whatever,
7  but she would greet people when they came there and have
8  them fill out the forms, the -- the -- the liability
9  waivers and show them a -- a DVD that we had that showed
10  them how to safely operate the jet ski.  She'd start
11  doing that while -- until I got back, and then I would
12  take them back out to the platform.  But on busy days it --
13  it apparently was good for business to have an extra
14  person be there so customers didn't leave, come and then
15  walk away.
16      Q.   So on days when it was slow there would be
17  nobody filling that position or they'd be out --
18      A.   On days -- on days that were slow we didn't
19  have anybody work that position.  We just put a sign on --
20  on the -- on the truck telling people to -- that I'd be
21  right back.  And then I would usually wind -- I would
22  usually -- we had walkie talkie communication and they
23  would call me out from the platform and tell me when they
24  needed -- I needed to come out and pick somebody up,
25  otherwise I would wait in the truck and wait for

Page 23

1  customers to approach me there.
2      Q.   Who would call you on the walkie talkie?
3      A.   Whoever was working the platform.  You had to
4  have somebody out on the platform at all times when jet
5  skis were operating.
6      Q.   You said usually a girl as the greeter.  Were
7  there other girls you can recall other than Jeannette
8  that filled that slot?
9      A.   Yes, there were.
10      Q.   Do you remember any of the names?
11      A.   Oh, gosh.  I can't remember the names, but
12  there were a couple other girls who had the job at
13  different times.  One of them became the girlfriend of
14  one of the guys who worked on the platform there, Mike, I
15  think.
16      Q.   What's Mike's last name?
17      A.   I don't remember Mike's last name, but he
18  worked on the -- he worked on the platform and one of the
19  girls became his girlfriend and they're still together, I
20  believe, now.  I don't know, you probably have their
21  names or something.  I don't know.
22      Q.   Do they live in Kona?
23      A.   Yes.  My last -- the last time that I ran into
24  them.
25      Q.   When was that?

Page 24

1      A.   Oh, six months ago probably.
2      Q.   Let -- let's talk about the operation a little
3  more broadly then.  So somebody works on the platform?
4      A.   Somebody has to be on the platform for the jets
5  to be operating.
6      Q.   And you got a licensed captain to run the boat?
7      A.   You have to have a licensed captain to operate
8  the boat.
9      Q.   And then at least on busy days a greeter?
10      A.   And a greeter on busy days, yeah.
11      Q.   So three -- three people in the shift?
12      A.   Right.
13      Q.   Okay.  Ever more than three, to your knowledge?
14      A.   No.
15      Q.   Sometimes two, sometimes three?
16      A.   Sometimes two, sometimes three.
17      Q.   Okay.  And Mike was one of the persons who
18  worked on the platform?
19      A.   Right.
20      Q.   Can you recall any of the others during your
21  time who were platform workers?
22      A.   Let's see.  Pat.
23      Q.   Patrick Shand?
24      A.   I believe, yes.  Yeah, Mike and Pat were the
25  two main guys who worked on the platform when I was

Page 25

1  working.
2      Q.   Can you recall any others?
3      A.   Not really.  Those are the only two guys who
4  come to my mind.
5      Q.   Other than yourself, there were other captains?
6      A.   Yes, there were.
7      Q.   Who were the other captains?
8      A.   Jessie was the main captain.
9      Q.   Jessie Kunewa?
10      A.   Yes.
11      Q.   He was the main captain?
12      A.   He was like the most senior, he was the senior
13  captain.
14      Q.   Okay.  Yourself, who else?
15      A.   Myself and then there was -- I think at
16  different times there was two other guys.  There was only
17  one at each time, but usually we just had three captains,
18  but there were two other guys and I don't recall --
19      Q.   Jeff Watson?
20      A.   Jeff Watson, yeah.
21      Q.   And then there was one more, you think?
22      A.   I thought there was somebody else who worked
23  part-time, but I never ran into him.
24      Q.   So there was only one captain on each shift
25  that was --

Page 26

1    A.    On each shift, yes.
2    Q.    As you understood it?
3    A.    Right.
4    Q.    Basically the operation consisted of people
5    renting jet skis going through the paperwork and video
6    the dock and then going out to the platform to ride, is
7    that --
8    A.    Correct.
9    Q.    Is that fair?
10   A.    Correct.
11   Q.    Let me ask you about this platform. First of
12   all, it's located in Kailua Bay, is that right?
13   A.    Yes, it is.
14   Q.    Okay. We have a little, small sized chart copy
15   of Kailua Bay. Let me -- photocopy of one. Let me hand
16   it to you, if I may.
17   A.    Okay.
18   Q.    You learn how to read charts --
19   A.    Oh, yes.
20   Q.    -- in your training --
21   A.    I did.
22   Q.    -- as a captain? Can you recognize that as a
23   depiction of --
24   A.    Oh, yes.
25   Q.    -- Kailua Bay?

Page 27

1    A.    Uh huh.
2    Q.    And looks to me like there's a Kailua pier
3    depicted up in the upper left middle?
4    A.    Yes.
5    Q.    You see it there, you can pick it out?
6    A.    Yes.
7    Q.    Okay. Now, would you be able to approximate
8    the location of the platform on this chart depiction for
9    us?
10   A.    Yeah. It looks like it's marked there.
11   Q.    It looks like it's marked?
12   A.    Looks like there's an ink mark right there at
13   that spot. It would be the approximate spot of the
14   platform.
15   Q.    Okay. Before you mark it, could you -- could
16   you show me what you're referring to?
17   A.    I didn't mark it, it looks like there's an ink
18   spot there.
19   Q.    Is it this that you're talking about?
20   A.    Yeah, somewhere right in that area is where the
21   platform would be.
22   Q.    My -- my glasses are, you know, I have to wear
23   these reading glasses, but those look like little
24   drawings of scuba divers to me.
25   A.    Do they?

Page 28

1    Q.    Take another look.
2    A.    Oh, yeah, they are. But that's the approximate
3    area, actually maybe out a little further from that --
4    the platform. Should -- should I mark it on it?
5    Q.    Well -- well, let's talk about it. I'm -- I'm
6    going to give you a red pen to mark -- mark things on in
7    a minute, but before you do, let's -- let's go over a
8    little bit.
9    A.    Okay.
10   Q.    Because we don't want to have a lot of extra
11   marks on it if we can avoid it.
12   A.    Okay.
13   Q.    Now, where -- do you know where the Royal Kona
14   Hotel is here in Kona?
15   A.    I'm looking -- I see it right here, the two --
16   Q.    Well --
17   A.    Right by -- right by where the arc comes in
18   would be it, so it would be out a little further from the
19   skin diver, so pretty much right off of that, just
20   slightly in shore, I mean just slightly in from --
21   towards the pier from the Royal Kona. But pretty much
22   right off the Royal Kona as you're pretty much out there
23   pretty close to it. Just slightly -- I'd say probably
24   straight out from -- like straight out from about
25   Huggo's, yeah, is probably just about where it's at.

Page 29

1    Q.    If -- if you went straight off shore from
2    Huggo's?
3    A.    Yeah, you'd been pretty -- pretty close to the
4    platform.
5    Q.    Okay. Is it possible to know where Huggo's is
6    on this chart?
7    A.    Yeah. It's just to the left of -- it's just
8    inside of that arc.
9    Q.    Okay. Now, if -- if you would, Captain
10   Rideout, I'm -- now -- now that you've got your bearings,
11   so to speak --
12   A.    Okay.
13   Q.    I'm going to ask you to mark first the pier,
14   the Kailua pier, and put an A next to it, or yeah, that's
15   fine, or actually, yeah, if -- if what you could do is
16   something like draw a line up into the big blank space
17   and then write Kailua pier from your line, that way we
18   can know what it is. Thank you. Okay. And then if
19   you'd put either an X or a mark or a rectangle or
20   whatever you choose to depict the location of the
21   platform at the time you were working on it in '03, and
22   then similarly a line out to the platform, that would be
23   helpful. Could you do that?
24   A.    Yeah. I'd say right about here.
25   Q.    Can -- can you either from your memory or using

8 (Pages 26 to 29)

Page 30

1  this chart or -- let me take the pen back from you.
2    A.  Okay.  Before I start marking things.
3    Q.  Yeah.  Exactly.  Exactly.  Okay.  Either using
4  the chart or your memory or both, can you give us an
5  estimate of the distance from the pier to the platform?
6    A.  From the pier to the platform?
7    Q.  Over water, yeah.
8    A.  I'd say about 2,000 feet.  Maybe a half mile.
9    Q.  Okay.  What's the platform constructed of, do
10 you know?
11   A.  Let's see.  It's got two pontoons, it's a
12 pontoon --
13   Q.  Pontoons with a deck between?
14   A.  With a deck between, yeah.
15   Q.  What are the pontoons made from, do you know?
16   A.  I believe it's steel.  I'm not -- that's what
17 my memory would tell me.
18   Q.  Okay.  Can -- can you approximate the
19 dimensions of this deck of the platform?
20   A.  Oh, probably 20 feet by ten.
21   Q.  20 long by ten wide?
22   A.  Yeah.
23   Q.  Does it have any house on it or awning shade or --
24   A.  It has a little awning over -- on it, yeah, on --
25 on one end.

Page 31

1    Q.  Does it have any storage lockers?
2    A.  It has some few little -- it has like a desk
3  and -- and -- and some -- some little storage lockers,
4  yeah.  That would be right.
5    Q.  Okay.  Does it ride up and down with the waves
6  there in the bay?
7    A.  Yes, it does.
8    Q.  Do you know how it's moored -- or strike that.
9  How was it moored at the time you were working at --
10   A.  It was on a -- it was on a mooring, but that
11 wasn't my responsibility.  I didn't dive on the mooring
12 or anything, so I don't know.
13   Q.  Okay.  Was it moored with a soft line, do you
14 know?
15   A.  I cannot recall.
16   Q.  Was it on a single point mooring, do you know?
17   A.  Just one mooring?  Usually on a -- on a multi
18 hull boat you have a bridle going to a single mooring.
19   Q.  Did you recall what this platform had for its
20 mooring configuration?
21   A.  It's a single mooring.  I know it's not -- it's
22 not on two moorings.
23   Q.  So it swings with the current or the wind?
24   A.  Swings with the -- everything does in Kailua
25 Bay.

Page 32

1    Q.  Okay.  That one included?
2    A.  Yes.
3    Q.  And then it would be possible to cut it loose
4  from its mooring, to your understanding?
5    A.  Would it be possible to cut it loose from its
6  mooring?  You mean as in -- to take it in for maintenance
7  or something like that?
8    Q.  Sure.
9    A.  I'm sure.  I mean I never saw it done, but I'm
10 sure.
11   Q.  It's capable of being done?
12   A.  That you could -- you can tow -- it's not a
13 vessel in itself and it doesn't have any power or
14 anything.  But you -- if you're -- if you had to haul it
15 out to work on it, you -- you -- you could disconnect it
16 and tow it to the harbor and work on it.
17   Q.  You could carry things on it to the harbor and
18 back again?
19   A.  That would probably not be advisable to carry
20 cargo on it or anything.  It wouldn't be a stable type of
21 vessel.
22   Q.  You could though, right?
23   A.  Huh?
24   Q.  You could, couldn't you?
25        MR. O'KANE:  Objection, calls for

Page 33

1  speculation.  Asked and answered.
2    A.  I would -- I would say it -- it would not be
3  prudent to take it into the seas with weight on the deck
4  unnecessary.  It was not -- it's not a -- it's not a --
5  it was made to be a platform and not made to -- to -- to
6  be in -- if it were my call as a captain, I would say
7  take everything off that could wash overboard and take
8  all weight off the deck before we move it.
9    Q.  (By Mr. McPherson)  Who did make it, do you
10 know?
11   A.  I don't know.
12   Q.  Who owns it, do you know?
13   A.  No, I do not.  I do not know.  I presume that --
14 that the company owns it.
15   Q.  Ted King's company?
16   A.  Yes, I presume that.
17   Q.  Does it have any registration that you're aware
18 of?
19   A.  It had registration on -- on it.  It has to
20 have registration on it.
21   Q.  A hull registration?
22   A.  Huh?
23   Q.  A hull registration?  What kind of registration
24 are you referring to?
25   A.  Well, it has to have some kind of certification

Page 34

1  if you're going to have people on it, I'm sure.
2      Q.  Okay.  Does it have --
3      A.  Actually, I can't -- you know, I -- I can't
4  recall ever seeing it so I can't tell you.  I can't say
5  for sure.
6      Q.  Fair enough.  Do you recall any numbers on the
7  side of it anywhere?
8      A.  I cannot recall.
9      Q.  Any documents on it?
10     A.  I cannot recall that now.
11     Q.  It's just your assumption then that because
12  people go aboard it needs to be certified in some manner?
13     A.  Right.  Right.
14     Q.  Okay.  What kind of vessel did you operate in
15  this jet ski business for Ted King?
16     A.  Oh, it was a -- I don't remember what the make
17  exactly was.  It was about an 18 foot skiff certified for
18  six passengers.  It was just -- it was just a six pack
19  boat.  It had an outboard motor on it and a little
20  console in the center that I drove from and fairly low
21  freeboard.  It's usually fairly calm in Kailua Bay.  It
22  was adequate for the mission that it was doing.
23     Q.  And was it always the same vessel that you
24  operated for this service?
25     A.  I believe it was, yes.

Page 35

1      Q.  Outboard power, you say?
2      A.  Yes.
3      Q.  The console steering midships?
4      A.  Yes.
5      Q.  Do you recall the size of the outboard, the
6  horse power?
7      A.  My best memory is it's about 50 horse power.
8      Q.  And are there any speed restrictions in -- that
9  you're aware of in traveling Kailua Bay?
10     A.  Oh, absolutely.
11     Q.  How -- how -- how fast or slow do you go?
12     A.  Uh --
13     Q.  Strike that.  Is it a no wake zone in there?
14     A.  In Kailua Bay?
15     Q.  Yes.
16     A.  I don't believe out in the bay is a no wake
17  zone.  In close to the pier definitely is, you have to
18  slow down considerably as you come in close to the pier,
19  that is a no wake zone.
20     Q.  Okay.  And what's the custom of speed out in
21  the bay in the vicinity of traveling to this platform?
22     A.  Oh, I would say about five miles an hour is
23  what we traveled going back and forth.
24     Q.  Slowing down when you approach the dock?
25     A.  And slowing down slower than that when you come

Page 36

1  into the dock, yeah.  Not that we, you know, everybody
2  always goes five miles an hour.  Sometimes you go faster
3  depending on -- on the situation, but generally you want
4  to keep it always to a safe speed.  It's not a far
5  distance, it doesn't take that long.
6      Q.  How long does it take?
7      A.  Um --
8      Q.  Approximately?
9      A.  Five minutes.
10     Q.  To -- to or from the platform and the pier?
11     A.  Right.
12     Q.  Let's go ahead and mark your -- the chart that
13  you kindly marked for us as Exhibit 3, if you could pass
14  that over to the court reporter, please.
15         (Chart marked Exhibit 3.)
16     Q.  (By Mr. McPherson)  Now, Captain Rideout, if
17  you would take ahold of the Exhibit 1, the handwritten
18  statement that we've marked, please --
19     A.  Uh huh.
20     Q.  Let me say first of all, your handwriting is a
21  lot better than mine, but still, since it is yours, and
22  to be sure we're reading it correctly, could I ask you to
23  read this short text into the record for us, slowly?
24     A.  On August 26, 2003, I arrived at work to find
25  the person I worked with was sick and wouldn't be coming

Page 37

1  in.  I called another employee, Mike, who said he would
2  be in as soon as he could.  I proceeded to fuel the boat
3  and was preparing to launch it at the Kailua pier, when
4  Jeannette arrived.  Jeannette normally does not work with
5  the boat or skis, but, there -- since no one else was
6  there I asked her to assist me in launching the boat.  I
7  handed her the bow and stern line and asked her to walk
8  the boat off the trailer as I backed it down.  I turned
9  to get in the truck and heard her fall right behind me.
10  We were standing on the ramp to ten feet from the
11  water's edge.  The ramp was very slippery.  The algae
12  having not been cleaned for many months.  Mike arrived at
13  that time and took her to the hospital as she had
14  sustained substantial injury to her head.  She had strong
15  pain in her ears and left a pool of blood on the slippery
16  ramp.  She apparently had no chance to stop her fall and
17  landed on her face.  Other boating professionals, myself
18  included had slipped there recently.  The walkway around
19  the slippery -- around the slippery part was blocked due
20  to construction on the pier.  The following week the
21  harbor maintenance people pressure blasted the ramp
22  cleaning off the algae.
23     Q.  Thank you.  Then is that your signature and
24  your handwriting at the bottom?
25     A.  That is.

1    Q.   And it looks like the date -- it's hard to
2  read, but can you make it out?
3    A.   Looks like September '03.  19 September '03 or
4  something, I'm not sure.
5    Q.   It's hard to make that out, isn't it?
6    A.   Yes.
7    Q.   Okay.  You -- I think you shared with us
8  earlier that this was prepared in response to discussing
9  the matter with Mr. King, is that right?
10    A.   I believe so.
11    Q.   At the time you prepared this, did you set --
12  set about to make it as accurate as you could?
13    A.   I can't recall.  I mean I'm sure that I -- I --
14  my -- my thoughts in preparing this were -- were -- I
15  mean I thought this poor girl, I wanted her to -- to have --
16  I -- I didn't think that it -- that it was her fault, I
17  thought that it was -- she slipped on this slippery
18  surface that should have been cleaned and I wanted her to
19  be able to be -- to have -- that's why I went back and
20  made -- and made that whole film, to try to make it so
21  that she had -- I thought she -- I thought she should
22  have sued the state.
23    Q.   Okay.
24    A.   I thought it was clearly -- everybody had been
25  telling those people to do that for a long time, to -- to

1  clean that surface, that it was -- that it was a hazard,
2  people had been slipping on it all the time and they were
3  due to have a bad one and they did, but the maintenance
4  people were very, very lax there.
5    Q.   The state maintenance people?
6    A.   Yes.
7    Q.   Thank you.  But I --I -- I really was just
8  trying to get --
9    A.   Okay, I'm sorry for going off.
10    Q.   No, that's okay, but I'm just trying to get
11  whether this is at least now accurate and correct as far
12  as you know all of the --
13    A.   It seems -- it seems like what happened, yeah.
14    Q.   And when -- when you wrote it, you were trying
15  to be accurate, is that fair?
16    A.   Yes, I -- I would say that's true, absolutely.
17    Q.   Is there anything in it that you just read that
18  you now believe is incorrect?
19    A.   No.  I mean I can't remember all of the details
20  as clearly as I had written them down here.
21    Q.   Right.  I understand.  I'm just trying to ask
22  you if -- if your knowledge of what happened has changed
23  at all in -- in essence from the time you wrote this?
24    A.   No.  No.  Other -- let's see.  When she -- when
25  she actually fell, I had actually just warned her about

1  the ramp being slippery, and right after I said that, I
2  turned, I just said -- she was going to back the trailer
3  off and I said be careful, the ramp's real slippery, and
4  I turned around and she went down just like that.
5    Q.   She went down in the same moment?
6    A.   As soon as I turned around I just -- I -- I
7  didn't actually see her fall, I turned around and I heard
8  her fall right behind me, like virtually right after I
9  said it to her.
10    Q.   Virtually right after?
11    A.   Yeah.  I mean it was -- if that's what stuck in
12  my mind about, was that I had just told her that and a
13  second later she slipped on it.  That's the only thing
14  that I would add to that, that -- that was in my memory.
15    Q.   Any reason you didn't add it at the time?
16    A.   I -- I didn't recall.
17    Q.   Pardon me?
18    A.   I don't -- I don't recall.  I just -- I noticed
19  that -- that I hadn't when I read it earlier today and it
20  was something that had stayed in my mind because just of
21  the nature of it that I had just told her that -- to be
22  careful of it and then boom, it happened immediately
23  afterwards.
24    Q.   You'd agree, wouldn't you, that someone not
25  knowing it was slippery there would be in a little bit

1  danger of getting hurt?
2    A.   But -- but you couldn't help but know that it's
3  slippery.  I mean you couldn't walk, you couldn't
4  actually walk on it without placing every foot carefully.
5  You would slip on your first step if you were casual.
6    Q.   That was her first step?
7    A.   Well, she was standing there, she was standing
8  on it.  She was standing on the slippery surface then.
9  And I just told her again it's very slippery, be real
10  careful, and turned around and bang.
11    Q.   Because you -- you didn't think she knew that
12  it was slippery already?
13    A.   No.  I just wanted to recaution her that --
14  that it was -- I mean it's obvious that -- that it's
15  slippery.  If you stood on it, you wouldn't be able to --
16  to virtually stand there unless you were making sure your
17  foot was flat on the surface.
18    Q.   How long had she been standing there?
19    A.   Hard to remember exactly, but it left time for
20  me to explain to her -- to hand her -- to hand her the
21  bow and the stern line from the boat.  She's standing
22  alongside of the -- of the boat handing her the bow and
23  stern line and telling her I'm going to back the trailer
24  down and I want you to just walk parallel to us and hold
25  the boat on the pier after it comes off the trailer.

Page 42

1 Q. That's what you were telling her?
2 A. Yeah.
3 Q. This was the first time she'd done it, correct?
4 A. Yes.
5 Q. To your knowledge, had she ever been over to
6 that ramp before?
7 A. Not that I can recall.
8 Q. Not in any of the times you worked with her?
9 A. No.
10 Q. That wasn't part of her job?
11 A. No. No.
12 Q. Whose job was it to launch the boat, typically?
13 A. It would be the -- the platform guy and the
14 captain.
15 Q. Who was the scheduled platform guy that day, do
16 you recall?
17 A. I believe it was Pat.
18 Q. And who was the greeter, if any, that day that
19 was scheduled, do you know?
20 A. That would have been Jeannette.
21 Q. If she testified she wasn't scheduled to work
22 that day --
23 A. She wasn't?
24 Q. -- and was called in -- was called in, does
25 that refresh your recollection at all?

Page 43

1 A. I have no memory of that.
2 Q. Okay. You don't remember any other girl being --
3 working around that time?
4 A. I don't remember who, if it was somebody else
5 scheduled at that time or not. I have no idea.
6 Q. Okay. You wrote Jeannette normally does not
7 work with the boat or skis. She didn't participate in
8 the launching of the boat, right?
9 A. Normally, no.
10 Q. Okay. Did she go out on the boat at all the
11 time you worked with her?
12 A. My best recollection is -- well, usually when
13 someone starts working they would go -- we would take
14 them out to the platform and show them the whole
15 operation so they'd be familiar with the operation, they
16 can talk to people about it.
17 Q. So you would expect that would have happened
18 with Jeannette?
19 A. Yes. I don't have any clear memory of her
20 going there or not though.
21 Q. That would have been the normal practice
22 though, for the captain in charge on the day she started
23 to take her off shore to the platform?
24 A. To take somebody out there and show them what
25 operation so they'd be familiar with what was going on.

Page 44

1 Q. On -- on the boat?
2 A. On the boat or on the platform so when
3 customers come up, they're going to -- she can answer
4 questions about what -- about what's going to happen.
5 Q. Okay. Did -- did you ever take her out to the
6 platform, to your recollection?
7 A. I can't recall.
8 Q. Okay. You can't recall one way or the other
9 whether you did or you didn't?
10 A. Yes, I can't recall at all.
11 Q. Did you like to jet ski yourself?
12 A. Yes, I did.
13 Q. Did you ever see Jeannette jet skiing during
14 this work time?
15 A. I -- I don't recall seeing her jet ski. She
16 may have. I mean it was -- I mean the employees would --
17 somebody had to take the jet skis out usually and when
18 you take them out, you tie them up and the captain might
19 jump on it and go for a ten minute ride before he goes
20 back in and starts bringing customers or whatever, you
21 know? It's one of the little perks was that you got to
22 ride the jet skis a lot.
23 Q. Did the platform people ever go in shore during
24 their work hours?
25 A. Did they ever go in shore?

Page 45

1 Q. To eat lunch, for example?
2 A. Usually they took the lunch out there with
3 them. If somebody had to leave, either couldn't have
4 people going out or you had to have somebody who was on
5 the platform even if it was --
6 Q. The greeter?
7 MR. O'KANE: Objection, calls for
8 speculation.
9 MR. MCPHERSON: Well, I'm just asking --
10 MR. O'KANE: Compound question.
11 Q. (By Mr. McPherson) I'm just asking for your
12 understanding, Captain Rideout. Was it in your
13 understanding?
14 A. I have done it. I have done it, I don't know
15 about the greeters. I -- I have taken people out and
16 then waited there with the boat or I've had -- when Pat
17 had to go in, I've had Pat take the boat in and then come
18 back out while I waited, but he couldn't bring passengers
19 with him. He could only go in if he had to go in and do
20 an errand and I could stay on the platform, and I have
21 good recollection of that.
22 Q. If -- if Jeannette testified that she went out
23 and fulfilled the platform role on occasion, would you
24 have any reason to disagree?
25 A. I wasn't always there, so I wouldn't know.

12 (Pages 42 to 45)

Page 46

1    Q.    So no reason really to disagree with that?
2    A.    Well, I --
3    Q.    Let me ask you this way.  Is it forbidden?
4    A.    Was it forbidden?  She'd have to have -- be
5    trained on it in order to do it and I -- I really
6    couldn't say.  I -- she didn't do it while I was there.
7    I'm -- I mean I don't want to say what she testified to.
8    You know what I mean?
9    Q.    Okay.  Who did the training of the people that
10   work on the platform?
11   A.    The platform person would do that.
12   Q.    Did you ever have the greeters ride in the boat
13   with you in the taking customers out?
14   A.    I recall having Pat's girlfriend go out a few
15   times.  That was recreational though because she was just
16   spending a little extra time with him going out to the
17   platform before work started or something.  The greeter
18   normally during work would not be going out there.  The
19   greeter would be on the dock at work time.  Any times
20   that -- other than that that one of the greeters was out
21   there was as recreational.
22   Q.    Even during work hours?
23   A.    Well, the only time -- you wouldn't -- you
24   wouldn't do it while they're -- while you're operating.
25   Mike's girlfriend would go out sometimes, and when we

Page 47

1    were going to bring the jets in, and she would ride for a
2    little while with him and then come in.  I can recall
3    that, but that's the only one that I can actually recall
4    in my own mind.
5    Q.    The greeters didn't jet ski during work hours?
6    A.    During work hours?  They would be on the pier
7    working if -- if they're -- I mean if they were working.
8    Q.    Let me ask it this way.  Did you ever see
9    greeters jet skiing during work hours?
10   A.    I just told you that Mike's girlfriend would go
11   out sometimes with him taking the jets out in the morning
12   and ride for a little bit, then come back in, and she did
13   work as a greeter.  I don't recall if she was working on
14   those days or not.
15   Q.    So that technically would have been within work
16   hours, I guess, is what you're saying?
17   A.    I don't recall if she was working at that time
18   or not.
19        MR. O'KANE:  Object, misstates his
20   testimony.  Let me put the objection on.  Misstates his
21   testimony, asked and answered.
22   Q.    (By Mr. McPherson)  Now you can answer, Captain
23   Rideout, if you would, please.
24        MR. O'KANE:  Would -- would you read
25   the question again, please?

Page 48

1        MR. MCPHERSON:  Let me restate it.
2    Q.    (By Mr. McPherson)  Captain Rideout, my
3    confusion is when they're taking the jet skis out to the
4    platform --
5    A.    Uh huh.
6    Q.    -- is that during work hours or before work
7    hours?  Maybe that helps to clear that up.
8    A.    Okay.  To get -- if you want to get it down to
9    a -- that would be before the greeter would start work.
10   Once the greeter would start work, they would not be on
11   the water.
12   Q.    Okay.  But during work hours for the platform
13   person?
14   A.    Well, the platform person is -- is on the job
15   when he shows up at the warehouse to pick up the trailer.
16   Your time starts right then.
17   Q.    Okay.  And when does the greeter's time start?
18   A.    The greeter's time starts at the -- at the time
19   that the customers start coming, which may be an hour and
20   a half later.
21   Q.    The reservation customers?
22   A.    Yes.
23   Q.    What did you see when you turned back after you
24   heard that sound that you described earlier?
25   A.    She was on the ground and she was bleeding

Page 49

1    pretty good from her head.
2    Q.    Was she --
3    A.    And I -- at first I thought -- I didn't imagine
4    she was hurt as badly as she was just from the falls.  I
5    mean she didn't fall from anything, just losing her
6    footing, from just dropping that distance, but it seemed
7    like she was hurt pretty -- pretty -- pretty well.  She
8    seemed to be bleeding and had a pain in her ear and I --
9    I believe her face was smashed pretty good, like she fell
10   right on her face without -- without catching herself.
11   Q.    Was she right on the -- I mean how long did she
12   stay on the ground after you turned around?
13   A.    Oh, I can't remember exactly.  I'm sure we -- I
14   didn't leave her sitting there or anything, but we like
15   moved her out of that area.
16   Q.    Right.  I mean -- what I mean is did she take a
17   little while getting up, do you recall?
18   A.    I can't recall.
19   Q.    Was she laying face down when you turned around
20   and saw her?
21   A.    I can't recall exactly, but I believe so.  That
22   would be my best guess.
23   Q.    What made you write that she had strong pain in
24   her ears?
25   A.    Must have been fresh in my mind then that she --

Page 50

1  that she was complaining of it.
2      Q.   Do you remember her holding her ear or anything
3  like that?
4      A.   I don't recall.
5      Q.   You wrote other boating professionals, myself
6  included have slipped there -- had slipped there
7  recently. You had slipped yourself at that place?
8      A.   Yes.
9      Q.   What happened?
10     A.   Well, I -- I didn't fall on my face or anything
11  though, but you know, I've -- I've lost my footing there,
12  and other people had, too, people who worked there on a
13  regular basis. Everybody was -- it was the talk of
14  pretty much every day, everybody was there, when the hell
15  are they going to clean this up, you know what I mean?
16  This is a hazard for everybody and talking about the --
17  the incompetence of the maintenance people was -- or the
18  laziness, whatever, the unmotivation of the maintenance
19  people. I can't say incompetence, they could have
20  cleaned it very easily, but it was -- they were
21  unmotivated to do it.
22     Q.   Sure. So it's fair to say it was dangerous
23  even for professional boating people who knew about it?
24     A.   Yeah. It was a dangerous situation there,
25  yeah.

Page 51

1      Q.   Did you typically launch the boat with -- with
2  a helper, with the second person, the platform person?
3      A.   That would be the way that you would typically --
4  I can do it myself fine if there was no -- if -- if it's
5  very calm, it's very easy to do. I can do it completely
6  all by myself. But if there's a little bit of chop, it
7  makes it a lot easier if you have a second person to take
8  the lines and walk the boat off as -- as you lower it
9  down.
10     Q.   Is -- is that why you asked Jeannette to help
11  that day?
12     A.   Yes.
13     Q.   You know, we're going to go over your video
14  clip in a little bit. But before we do, I'm wondering
15  could you -- could you kind of sketch in rough layout how
16  the ramp looked and then put in the relation -- in
17  relation to that where the boat, the truck and the
18  trailer, yourself and Jeannette were at the time the
19  accident occurred?
20     A.   Okay.
21     Q.   You think you could do that?
22     A.   Sure.
23     Q.   Okay. Why don't we go off the record to let
24  Captain Rideout do that?
25          THE VIDEO SPECIALIST:  The time is now

Page 52

1  10:25 a.m. and we're going off the record.
2          (Discussion off the record.)
3          (Drawing marked Exhibit 4.)
4          THE VIDEO SPECIALIST:  The time is now
5  10:33 a.m. and we are back on the record.
6      Q.   (By Mr. McPherson) Captain Rideout, after the
7  break is there any of your previous testimony you feel
8  you need to correct or amend in any way?
9      A.   Nothing I can think of.
10     Q.   All right. And you were kind enough to prepare
11  a sketch for us while we were off the record that we've
12  marked as Exhibit 4 for reference?
13     A.   Correct.
14     Q.   And may I look at that, please?
15     A.   Sure.
16     Q.   This depicts the approximate placement of the
17  truck, boat and trailer, water line, yourself and
18  Jeannette at the dock?
19     A.   Correct. I'm not sure exactly where that water
20  line is in relationship to the stairs there, but
21  somewhere in there.
22     Q.   Okay. In any event, this is a bird's eye view
23  depiction of your approximation of the layout?
24     A.   Right.
25     Q.   At the -- at the time that she fell?

Page 53

1      A.   At the time she fell, right.
2      Q.   All right. With that, I want to -- I want to
3  work with you with your video clip, if we can. And
4  should have done that while we're off the record. I'm
5  going to move it up close with you with my mouse so I can
6  control it, and what -- what I'm going to do for
7  everyone's benefit is I want to just play it and ask you
8  to read along the transcript as it plays, the transcript
9  that we marked as Exhibit 2, and at the end of that
10  exercise, although it's fairly obvious when we hear your
11  voice, just for formality's sake I'm going to ask you to
12  indicate on the transcript when you are speaking as you
13  hear it, in other words, to identify your own voice as
14  you read those words. Do you -- do you follow me or am I
15  confusing you?
16     A.   No, I'm -- I'm not following you.
17     Q.   All right. Let me try again. I'm going to
18  play the video so that we can hear you talking, which
19  I've been given to understand is you talking on the
20  video?
21     A.   Right.
22     Q.   And the court reporter has transcribed that
23  voice talking onto the paper before you?
24     A.   Right.
25     Q.   And the purpose of this exercise is merely to

Page 54

1  ask you to confirm hearing your own voice.
2      A.   If this is that?
3      Q.   And those are your words, correct.
4      A.   Okay.
5          THE VIDEO SPECIALIST:  We're going to
6  go off the record and set up the equipment.  The time is
7  now 10:35 a.m.
8          (Discussion off the record.)
9          THE VIDEO SPECIALIST:  Okay.  The time
10  is now 10:37 a.m. and we're back on the record.
11     Q.   (By Mr. McPherson)  Okay.  Captain Rideout,
12  we've set up the laptop with the video clip ready to
13  play.  Let me ask you a few questions about the
14  background of the video clip.  First of all, do you
15  recall when you shot this video clip?  Or let me -- let
16  me ask you this.  Was it the same day of the accident?
17     A.   I believed it was the same day or else it was
18  the following day, but I think it was -- I may not have
19  been able to get the camera that day, I may have gone the
20  next day and shot it.  It was either that day or the next
21  day.  I had to go borrow a video camera in order to shoot
22  it.
23     Q.   Okay.
24     A.   But I thought it was important to do it right
25  away.

Page 55

1      Q.   Okay.  And why was that?
2      A.   Because I thought it was such a clear liability
3  of the state's that I wanted Jeannette to have -- I shot
4  it for Jeannette, not for Ted, and I wanted her to have
5  that evidence in case it was cleaned up really quickly,
6  which it was.
7      Q.   In case the dock was cleaned up really quickly?
8      A.   Yes.
9      Q.   It was cleaned up soon after?
10     A.   I think a week later it was cleaned.
11     Q.   All right.  So this video was to document the
12  condition of the dock at the time she had her accident?
13     A.   Correct.
14     Q.   And what medium did you shoot it in?  You say
15  you borrowed a video camera.  Do you shoot it digitally
16  or --
17     A.   It was a digital, it was on a -- it was on a
18  little -- it was on a little tape, a little -- small,
19  little --
20     Q.   A mini VHS?
21     A.   A mini VHS tape, yeah.
22     Q.   Digital format?
23     A.   Yeah.
24     Q.   Do -- do you remember what happened to the --
25  or strike that.  Do you know what happened to the

Page 56

1  original tape that you shot?
2      A.   I sent it to Ted.
3      Q.   Ted King?
4      A.   To Ted King, yes.
5      Q.   And how long after you shot it, do you recall?
6      A.   I -- I had it for a long time.  And I didn't
7  even -- I never -- I tried to get ahold of Jeannette, I
8  never was able to get ahold of her to give it to her, and
9  then I just stuck it in a drawer or something and then I
10  dug it out sometime later.  I -- I found it and -- and I
11  just took it down to the pier and gave it to the --
12  whoever was the captain there and said see that Ted gets
13  that.
14     Q.   Like in an envelope or something?
15     A.   Yeah.
16     Q.   Was that at the time you were still working for
17  the company?
18     A.   No, no.  That was much later.
19     Q.   All right.  With that then, as I discussed
20  before we went off the record last time, what I'd like to
21  do now is play it for you and ask you to read along with
22  the paper transcript that you have before you.  Let's run
23  through it once and I hope it will be relatively easy for
24  you to identify your voice as opposed to the others.  But
25  if we need to, we can play it a second time, all right?

Page 57

1      A.   Okay.
2      Q.   Here we go.
3          (Video plays.)
4      Q.   (By Mr. McPherson)  Captain Rideout, is that
5  your voice we just heard?
6      A.   That was my voice.  The other voices we heard
7  earlier were other people in the background who were
8  watching me film, I think.
9      Q.   Okay.
10     A.   Who said evidence, evidence, and that I'd slip
11  for you if I had shoes on or something like that.
12     Q.   If I could, let me draw your attention to page
13  two of Exhibit 2.
14     A.   Uh huh.
15     Q.   And you see at line four there's the heading
16  mail videotaper, you see that?
17     A.   Yes.
18     Q.   Okay.  And then it says out in this area it's
19  fairly solid because of the grips, and then it goes on?
20     A.   Uh huh.
21     Q.   You see that?
22     A.   Yes.
23     Q.   Okay.  That's you speaking?
24     A.   That's me speaking there.
25     Q.   Okay.  What I'd like to do is -- be perfectly

Page 58

1  happy to let you watch the video, if you want to do that
2  first, then go back and ask you to, you know, follow
3  along reading the transcript to confirm your words when
4  you're speaking, or if you don't mind, we can just let
5  you hear it the first time through and then go back and
6  look at it.  Do you have a preference?  Did I -- did I
7  confuse you again?  I'm sorry.
8      A.   Yeah.  Let's -- let me go ahead and listen to
9  it so I can distinguish which is me and which is not on
10  this.
11     Q.   Okay, ready to read along?
12     A.   I -- I will try to here, yeah.
13     Q.   Okay.  And then we'll go back and we'll watch
14  it if you like.
15     A.   Okay.
16     Q.   So we can do that.  I think it's just hard to
17  do both.
18     A.   Oh, you mean read it out loud along?
19     Q.   No.
20     A.   Oh, just read to myself?
21     Q.   Yeah.
22     A.   Yeah.
23     Q.   If you can just follow on the paper.
24     A.   Right.
25     Q.   As you hear it.

Page 59

1      A.   Right.
2      Q.   Okay.  Here we go.
3           (Video plays.)
4      Q.   (By Mr. McPherson)  Okay, Captain Rideout --
5      A.   Okay.
6      Q.   Let's do it this way, I think.  I'm going to
7  see if we can identify the parts in this transcript that
8  are not your words as opposed to the ones -- the -- the
9  portions that are.
10     A.   Okay.
11     Q.   There's much more of it is your words than not,
12  correct?
13     A.   Right.  Yeah.
14     Q.   Okay.  So why don't we try and go through that
15  together?  Again, page two, it looks to me, and after
16  having heard the film with you that on page two, lines
17  one through three, see the -- the line numbering in the
18  left margin?
19     A.   Yeah.  Those are not me.
20     Q.   Those are not you?
21     A.   Right.
22     Q.   Okay.  And then lines four through 22 on page
23  two are you, is that correct?
24     A.   Yes.
25     Q.   Okay.  And then on page two, lines 23 through

Page 60

1  25 are not you, is that correct?
2      A.   Not me, yes.
3      Q.   Okay.
4      A.   Those sound like they're the parasail guys who
5  are -- you could see their boat there, they were
6  launching right there and they were -- they were making
7  comments about --
8      Q.   Is that who --
9      A.   -- about the ramp, too, right there, yeah.
10     Q.   That's who you were talking to?
11     A.   Yeah.
12     Q.   What parasail company is that?
13     A.   UFO Parasail.
14     Q.   Anybody you remember particularly by name that
15  was there that time when you were filming this?
16     A.   Might have been Steve, who runs the operation.
17     Q.   Do you know Steve's last name?
18     A.   If you call the parasail, they'll tell you.
19  He's -- he's the manager of it for many years.
20     Q.   Okay.  Anyway, going onto page three and page
21  four, are those all your words on page three and page
22  four other than the transcription of, of course, audio
23  difficulties and video difficulties?
24     A.   I believe so.  Yes.
25     Q.   All right.  And as with your written statement

Page 61

1  that we went over earlier, Exhibit 1, the words you spoke
2  in this video you intended to be as accurate as possible
3  in describing --
4      A.   Yes.
5      Q.   -- the situation and the accident?
6      A.   Yes.
7      Q.   Okay.  You stand by them today?
8      A.   Yes.
9      Q.   There was one spot you see on page three, it's
10  indicated in the transcript around lines nine and ten
11  where we had audio and video difficulties?
12     A.   Uh huh.
13     Q.   You -- you see that?
14     A.   Yes.
15     Q.   Okay.  By any chance, do you recall what you
16  were saying during that portion?
17     A.   No.
18     Q.   Okay.
19     A.   I didn't do a very good job of shooting the
20  video.  I see this as I look at it now, it's really
21  jiggly.
22     Q.   Well --
23     A.   It could have been a better job, especially
24  pointing out the exact spot where the accident happened.
25  I had it moving around a lot there and didn't -- I could

Page 62

1  have pinned it down exactly, that would have been better,
2  but that's what it is.
3      Q.    You did the best you could?
4      A.    Yeah.
5      Q.    Did you give any other written statements
6  regarding this case at any time, Captain Rideout, other
7  than the one we've already gone over, your handwritten
8  one?
9      A.    None that I recall.
10     Q.    Any other recorded statements other than this
11 video clip, either sound or video recording that you
12 recall?
13     A.    I -- Mark may have recorded, made a tape when I
14 was talking to him.
15     Q.    That time over lunch?
16     A.    Over lunch, yes.
17     Q.    Sound recording?
18     A.    Sound recording, yes.
19     Q.    Do you recall what you said in that sound
20 recording?
21     A.    I don't recall, no.
22     Q.    Can't recall any of it?
23     A.    No.
24     Q.    But it pertained to the case back then?
25     A.    Yes.  Yes.  Yeah.

Page 63

1      Q.    The accident, in other words?
2      A.    Right.  Right.
3      Q.    What was the normal start time for you on -- or
4  strike that.  What time were you supposed to start work?
5      A.    I think I usually started at eight.  We would
6  usually get customers -- the earliest we would get
7  customers would be nine.
8      Q.    Was there a time that you started on the day of
9  the accident that you can recall?
10     A.    I have no -- no recollection.
11     Q.    Do you recall what time the first customers
12 were that day?
13     A.    I do not recall.
14     Q.    Do you recall if the operation continued after
15 Jeannette's operation -- accident that day?
16     A.    Um --
17     Q.    In other words, did the company work?
18     A.    I do not recall exactly, I -- but there was --
19 with no one to work the platform we would not have been
20 able to work until -- Mike took her up to the hospital.
21 We wouldn't have -- we wouldn't have been able to work
22 until Mike had returned.
23     Q.    Did he return, do you recall?
24     A.    I believe so, but I don't remember the details.
25     Q.    Were you trying to get the boat launched by

Page 64

1  yourself as quickly as possible before Jeannette arrived?
2      A.    I was not under pressure to do it as quickly as
3  I could or anything.
4      Q.    You weren't running late?
5      A.    I don't recall being in -- being in a
6  particular rush.
7      Q.    The person that didn't show up was supposed to
8  have met you at the shop?
9      A.    Correct.
10     Q.    And that would have been Patrick, you thought?
11     A.    Right.
12     Q.    Okay.  So did you call the company to let them
13 know that you needed replacement?
14     A.    I don't -- I don't -- I don't -- I don't
15 remember.  I probably called Mike directly since the
16 company was over on Maui.  I mean we had -- we had walkie
17 talkie telephones to them, but early in the morning we
18 might not even reach anybody there.
19     Q.    Okay.  So did you learn Patrick wasn't coming
20 in from him or from the company, do you remember?
21     A.    I don't recall.
22     Q.    So you were awaiting Mike's arrival to take the
23 skis out?
24     A.    My best recollection is that I was going ahead
25 and launching.  I wouldn't be able to take the skis out,

Page 65

1  but that I was launching the -- the boat.  After I
2  launched the boat, then I have to take the trailer and go
3  get the skis.
4      Q.    Okay.  You tie the boat up at the dock?
5      A.    I tie the boat up to the dock, park that
6  trailer and go pick up the other trailer and bring the
7  other trailer back and then launch the jet skis.
8      Q.    Are they ridden out to the platform typically?
9      A.    They're towed usually by one of the jet skis.
10 We hook them altogether and the jet ski platform guy
11 drives the lead jet ski and he has them like ducks out
12 behind him.
13     Q.    In a string?
14     A.    In a string, yeah.
15     Q.    Three behind him?
16     A.    Three or we take up -- we -- we could take up
17 to six skis total.
18     Q.    All right.  So he or she could tow five behind?
19     A.    Could tow five behind it.
20           MR. MCPHERSON:  Yep.  Off the record.
21           THE VIDEO SPECIALIST:  The time is now
22 10:57, we are going to go off the record.  This is the
23 end of tape one.
24           (Discussion off the record.)
25           THE VIDEO SPECIALIST:  The time is now

Page 66

1   11:02 and we're back on the record.
2       Q.   (By Mr. McPherson) Captain Rideout, was Mike
3   very aware of the slipperiness of that ramp where the
4   boat launching took place typically?
5       A.   I'm sure.
6       Q.   And Patrick?
7       A.   I'm sure.  Yeah.
8       Q.   In other words, the regular crew that worked
9   with it were aware?
10      A.   I'm sure -- I'm sure that they would have been
11  aware, yeah.  Everybody -- everybody who used that ramp
12  was aware of it.  It was -- you could hear from the
13  background, it was -- I mean I was videotaping it then so
14  people were interested, but it was a topic of
15  conversation.  If you were using the ramp and another
16  boat was using the ramp, you would always be complaining
17  about that slipperiness and why the state hadn't done
18  something about it.
19      Q.   Had you talked to Jeannette about it at all
20  before the day of the accident?
21      A.   The only one -- the only time that I -- that --
22  that it -- that I remember distinctly was just before she
23  fell.
24      Q.   Virtually before she fell?
25      A.   Yeah.

Page 67

1       Q.   Do you remember any other occasions other than
2   distinctly?
3       A.   I can't recall.
4       Q.   There would have been no reason to discuss that
5   with her when -- given her job description, would there?
6       A.   She normally wouldn't be in that area.
7       Q.   So affirmative, there would be no reason to
8   talk to her about it?
9       A.   Right.
10      Q.   Captain Jessie I think shared with us yesterday
11  that there's a list kept of pass -- of customers,
12  reservation list of some kind.  Does that ring a bell for
13  you?
14      A.   For -- there -- there -- there would be a
15  record of -- of each customer.
16      Q.   There would be?
17      A.   There should be, yeah.  Yeah, because there was
18  part of our commission was based on -- on how many
19  customers that we -- that rode.
20      Q.   Okay.
21      A.   So there was a tally of how many customers were
22  riding.
23      Q.   Was there a reservation list with names on it
24  or any other identifying document that would show the
25  names of the people who -- who --

Page 68

1       A.   Everybody had to sign a waiver who went out to
2   the platform.  Whether you were going to ride or just go
3   out to the platform and watch somebody ride, you still
4   had to sign the waiver before you could go on the boat.
5       Q.   With name and address information?
6       A.   Yes.
7       Q.   Do you know if the company maintains those
8   records?
9       A.   I have no idea.
10      Q.   Were any logs of any type kept with respect to
11  the operation of the boat?
12      A.   A regular log?
13      Q.   Any kind of log?
14      A.   No.  Just would be like you checked everything
15  every day before you took off, that was all.  Check the
16  fuel, check the oil, checked everything running.
17      Q.   But no entries like leave the dock, return to
18  the dock?
19      A.   No.  No.
20      Q.   Passengers aboard, et cetera?
21      A.   No.
22      Q.   Was there a time sheet -- excuse me, time sheet
23  kept for payroll purposes in your -- in the shift crew?
24      A.   That was back at the warehouse where we kept
25  the jet.  We had a -- a little office there, little desk

Page 69

1   there.
2       Q.   With the names of the workers who worked that
3   day?
4       A.   Yeah.
5       Q.   And their hours?
6       A.   That should have been there, yeah.
7       Q.   Any other information contained on that sheet
8   that you recall?
9       A.   Hours and how many passengers you flew that
10  day.
11      Q.   Flew?
12      A.   Well, we call it -- you know, I mean how many
13  passengers rode that day.
14      Q.   On the jet skis?
15      A.   Yeah.
16      Q.   Are you aware of any other written report of
17  this accident other than the written statement you
18  yourself prepared?
19      A.   I don't recall any.  I don't know of any other.
20      Q.   You didn't fill out any of the accident forms
21  yourself that you can remember, or -- or did you?
22      A.   Not that I recall.
23      Q.   Did you yourself train -- train Jeannette
24  Miller in any of her job duties?
25      A.   I can't recall.

Page 70

1    Q.   Can't recall doing it?
2    A.   No.
3    Q.   Do you have any knowledge of anyone who did
4    instruct her in her duties?
5    A.   I can't remember.
6    Q.   Who would have supervised her during her work,
7    to your understanding?
8    A.   Whoever was the captain.
9    Q.   The captain would be in charge?
10   A.   He would be the only one who would even see her
11   because she would be waiting at the -- at the -- at at
12   the truck.  And the captain comes and goes to the pier
13   and back to the truck.  I mean from the pier to the -- to
14   the platform, so he'd be at the truck between each run
15   and picking up the new passengers.  Usually when you're
16   bringing passengers in, you walk them back up to the
17   truck, hopefully she has other passengers that are ready
18   for you to take and walk back to the -- to the skiff, so
19   you would see her then.  It was -- there wasn't really
20   much supervising to her job, it was very casual job.  It
21   was essentially just being there and greeting people and
22   showing them the -- the video.
23   Q.   How did you come to that understanding of her
24   job, just by the custom of your working there?
25   A.   Yeah.  Originally they didn't -- they didn't

Page 71

1    have anybody doing that, to just -- thought that on busy
2    days it would be good to have somebody, making sure we
3    didn't lose any customers while the captain was away on
4    busy days.
5    Q.   As a captain, did you have any training from
6    the -- from the company about that employee's work
7    duties?
8    A.   Just what needed to be done.  That they needed
9    to see the video and that they needed to understand the
10   waiver and sign the waiver.  And then --
11   Q.   That's it?
12   A.   That's it, yeah.
13   Q.   Okay.  Did you ever observe Jeannette walking
14   with passengers from the truck to the skiff?  Customers,
15   let's call them?
16   A.   I can't say if she did or not.
17   Q.   How about assisting them getting on or off the
18   boat at any time?
19   A.   Generally I would assist people getting on and
20   off the boat.  That was kind of a -- my -- my -- my
21   procedure.  She usually wouldn't be there for -- I mean
22   the greeter's not going to be there when you bring people
23   in.  And I would get off first and then have my hand
24   there because they -- they would step from the boat onto
25   a little two stair thing we had set onto the dock, and I

Page 72

1    would make sure I took each person's hand as they went
2    across there and walked them across it.
3    Q.   Did you ever observe her assisting in that
4    process?
5    A.   I cannot recall.  I couldn't say yes or no.
6    Q.   Fair enough.  How about on the platform, is
7    there a need to assist the customers on or off the
8    platform?
9    A.   No.
10   Q.   Out in the bay?
11   A.   It's fairly easy there.  The boat and the --
12   and the -- and the dock are -- the guy who's working the
13   platform will be there if someone needs assistance.  Some
14   people need much more assistance of course than other
15   people.  We had a guy who fell off a jet ski, we couldn't
16   get him back onto anything.  He weighed 300 pounds and we
17   had to tow him in.
18   Q.   You had to tow him in in the water?
19   A.   We couldn't get him back on once he fell off.
20   And he was too big to get -- we couldn't get him up.  We
21   had to take him in.
22   Q.   Was he okay?
23   A.   Yeah.  He was fine.
24   Q.   Was there any rule against Jeannette helping
25   the passengers on or off the boats?

Page 73

1    A.   Not that I can recall.
2    Q.   Was there any rule against her helping them on
3    the boats, in other words, riding with them?
4    A.   I -- I can't think of any rule against it.  No.
5    Q.   I don't have any further questions.
6    A.   Okay.
7    BY MR. O'KANE:
8    Q.   I've just got a few, Doug.  How many days do
9    you recall working with Jeannette before she was injured?
10   A.   Just a few.  I didn't really know her, just a --
11   a few days.  She was only with -- it was just a short
12   time after she was hired that she had the accident.
13   Q.   Would -- would you estimate two or three days?
14   A.   That I worked with her, probably.
15   Q.   You mentioned complaints to the harbor master.
16   Well, you -- you mentioned that the -- the -- everybody
17   was complaining about the ramp.  Are you aware of any
18   complaints to the harbor master?
19   A.   That were formal?
20   Q.   Either oral or informal?
21   A.   I can't remember any specifically.
22   Q.   Did you ever make any oral complaints to the
23   harbor master or anybody that worked for the State of
24   Hawaii?
25   A.   Not that I could pin down to a specific time

Page 74

1   when I talked to somebody.
2       Q.   Are you aware of -- of anybody else that might
3   have made complaints to --
4       A.   Not that I could say specifically.
5       Q.   You -- you mentioned her, Jeannette's title as
6   a greeter.  Was -- was that also referred to as a booth
7   attendant?
8       A.   Yes.
9       Q.   Just to go over your map a little bit, the one
10  that you -- you -- the --
11      A.   Here?
12      Q.   No.  Not that one.  The -- the one --
13      A.   This one.
14      Q.   Where you put the location of the -- you -- you
15  said that the -- jet ski platform was right off of
16  Huggo's, is that correct?
17      A.   Yeah, I maybe a little in here -- it may be a
18  little teeny bit further out, but pretty close to this
19  arc line here.
20      Q.   Well, that's my point, because here, as I read
21  this map, this is the road that comes along, right along --
22      A.   Alii Drive, yeah.
23      Q.   That splits off, is that correct?
24      A.   Right.
25      Q.   And isn't Huggo's right here as -- right after

Page 75

1   the split off?
2       A.   No.  This would be -- this is like the church
3   down in this area and then this is the Uncle Billy's
4   complex there.  And then there would be like Lava Java
5   would be here, and this is the Kona Resort.
6       Q.   This -- this right here?
7       A.   Right there, I believe, yes.
8       Q.   What is this facility, just the top?
9       A.   That's the --
10      Q.   We have this on video and we're referring to it --
11      A.   That's Uncle Billy's -- what is it called, what
12  does he call his complex there where he's got like a -- a
13  whole bunch of shops and stuff there.  It's --
14      Q.   Okay.
15      A.   The restaurant there is the Kona Bay Inn.  What
16  is it called, the --
17          MR. MCPHERSON:  Kona Inn?
18      A.   The Kona Inn, yeah.
19          MR. MCPHERSON:  It's been there since
20  the '40s.
21      A.   The Kona Inn is right there.  Huh?
22          MR. MCPHERSON:  It's been there since
23  the '40's.
24      A.   Since the '40's, yeah.  Yeah.  This -- this
25  building -- Uncle Billy's complex has been there for a

Page 76

1   long time.  And this -- this is -- the platform is -- is
2   outside of Uncle Billy's.
3       Q.   (By Mr. O'Kane)  Okay.
4       A.   And pretty much just kind of off shore from the --
5   from Huggo's.
6       Q.   Was there -- was it common for -- you mentioned
7   that Mike's girlfriend went out when she was off the
8   schedule, is that correct, and she would stay there with
9   him?
10      A.   Yeah, sometimes.
11      Q.   And -- and she would drive the -- she would
12  ride the jet skis when she was out there?
13      A.   She would sometimes ride jet skis --
14      Q.   Would -- would --
15      A.   With him.  With him.
16      Q.   Would Jeannette be allowed to do the same thing
17  when she wasn't working, to come out there and ride the
18  jet skis?
19      A.   I can't say that she wouldn't.  I don't recall
20  it, but I can't say that -- that she wouldn't be allowed
21  to.
22      Q.   She would not be allowed?
23      A.   No, no, I can't say that, that she wouldn't be
24  allowed to.  Mike's girlfriend went because Mike was --
25  Mike was -- had access to it there, so it was something

Page 77

1   that they did together kind of.  If she ever rode, it
2   would have been a -- it would have been a -- like a comp.
3   I mean it would be like a -- just a -- a fringe benefit
4   if you -- that's how we all looked at getting jet ski
5   time in.
6       Q.   That was not part of her job description?
7       A.   But it wouldn't be part of your job.  It would
8   be external from your job.
9       Q.   That would be recreational?
10      A.   Recreational use, yeah.
11      Q.   When they signed the waivers, the passengers
12  signed the waivers, the greeter had those in her
13  possession, is that correct?
14      A.   Yes.
15      Q.   What -- what did the greeter do with those at
16  the end of the day, do you know?
17      A.   We kept all those.
18      Q.   When you say we, who -- who is --
19      A.   Well, it would have been -- let me see.  Those
20  would have gone into the office at the end of each -- of
21  each day.  It's your only record if somebody comes back
22  to sue you, it's your only recourse.
23      Q.   Okay.  When you say would have gone into the
24  office, how -- does it go back to the warehouse?
25      A.   Would go back to the warehouse and then be --

hihi-oodook

hihi

---

**Header:** Case 1:04-cv-00441-BMK   Document 95-6   Filed 09/07/2006   Page 22 of 23

**Page 78**

1  and then every few days the records would all go over to
2  the main office.
3  Q.  And who would do that, who would physically --
4  A.  Ted would come over about once a week and pick
5  stuff up.
6  Q.  Would -- would Ted pick those up and bring them
7  back?
8  A.  Ted would or else Jessie would send them over.
9  Jessie was the -- the lead captain.
10  Q.  Do they keep any records at all in the
11  warehouse down there?
12  A.  They'd be there for a little while until they
13  got sent over.  Probably twice a week they went over to
14  Maui.
15  Q.  Did Miss Miller, Jeannette's job description
16  include loading or unloading any vessels?
17  A.  No.
18  Q.  Did her job description include building or
19  repairing any vessel?
20  A.  No.
21  Q.  As part of Miss Miller's job description, did
22  she routinely board the vessel itself?
23  A.  No.
24  Q.  I think that's all I have.
25  BY MR. MCPHERSON:

**Page 79**

1  Q.  Captain Rideout, do you have any knowledge of
2  what Jeannette Miller did on the job on the days other
3  than when you worked with her?
4  A.  I have no knowledge.
5  Q.  I have no further questions.  Thank you very
6  much.
7  A.  Okay.  Okay.
8  THE VIDEO SPECIALIST:  The time is now
9  11:19 a.m.  We're going off the record and that concludes
10  today's deposition.
11  (Discussion off the record.)
12  (DVD marked Exhibit 5.)
13  MR. MCPHERSON:  Back on the record.
14  For the last housekeeping matter, the record will reflect
15  that we have now marked the video clip Captain Rideout
16  discussed during his testimony as Exhibit 5.  And with
17  that, I have nothing further.
18  MR. O'KANE:  Nothing further.
19  (Deposition concluded at 11:20 a.m.)
20
21
22
23
24
25

**Page 80**

1  I, DOUGLASS RIDEOUT,
2  hereby certify that I have read the foregoing typewritten
3  pages 1 through 79, inclusive, and corrections, if any,
4  were noted by me, and the same is now a true and correct
5  transcript of my testimony.
6  DATED:  Honolulu, Hawaii, _____.
7
8
9  _____
10
11
12
13  Signed before me this _____
14  day of _____, 2006.
15
16
17  _____
18
19
20  Miller vs. Maui Ocean Activities, Inc., et al,
21  04-00441BMK, 6-27-06
22
23
24
25

**Page 81**

1  C E R T I F I C A T E
2  STATE OF HAWAII        )
3  ) SS.
4  CITY AND COUNTY OF HONOLULU   )
5  I, SHIRLEY L. KEYS, Notary Public, State of
6  Hawaii, do hereby certify:
7  That on June 27, 2006 at 9:29 a.m., appeared
8  before me Douglass Rideout, the witness whose deposition
9  is contained herein; that prior to being examined he was
10  by me duly sworn;
11  That the deposition was taken down by me in
12  machine shorthand and was thereafter reduced to
13  typewriting under my supervision; that the foregoing
14  represents to the best of my ability, a true and correct
15  transcript of the proceedings had in the foregoing
16  matter.
17  I further certify that I am not an attorney
18  for any of the parties hereto, nor in any way concerned
19  with the cause.
20  DATED this _____ day of _____, 2006,
21  in Honolulu, Hawaii.
22  _____
23  SHIRLEY L. KEYS, CSR 383
     Notary Public, State of Hawaii
     My Commission Exp. May 19, 2007
24
25

21 (Pages 78 to 81)

1

2

3

4