# EXHIBIT "E"

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3

 4   JEANNETTE MILLER,         ) CIVIL NO. 04-00441 BMK

 5            Plaintiff,       ) (Admiralty)

 6       vs.                   )

 7                             )

 8   MAUI OCEAN ACTIVITIES,    )

 9   INC., ("MOA"), THEODORE   )

10   C. KING, BETH D. KING,    )

11   In Personam and MOA       )

12   VESSEL, In Rem,           )

13            Defendants.      )

14   _____    )

15

16         VIDEOTAPED DEPOSITION OF JESSE KUNEWA

17

18   Taken on behalf of Defendants at the offices of Ralph

19   Rosenberg Court Reporters, Incorporated, Suite D212,

20   75-170 Hualalai Road, Kailua-Kona, Hawaii, commencing

21   at 2:42 p.m. on June 26, 2006, pursuant to Notice.

22   REPORTED BY:

23      DEBORAH A. NG, CSR 336

24      Registered Professional Reporter

25      Notary Public, State of Hawaii
```

**EXHIBIT "E"**

Page 2

```
 1              APPEARANCES
 2
 3   For Plaintiff         HOWARD G. McPHERSON, ESQ.
 4   Jeannette Miller:     600 Davies Pacific Center
 5                         841 Bishop Street
 6                         Honolulu, Hawaii 96813
 7
 8   For Defendants        JOHN O'KANE, ESQ.
 9   Maui Ocean Activities, Frame Formby & O'Kane
10   Inc., et al.:         Four Waterfront Plaza
11                         Suite 575
12                         500 Ala Moana Blvd.
13                         Honolulu, Hawaii 96813
14
15   Also Present:         The Videographer,
16                         Robert Whitman
```

Page 3

```
 1              I N D E X
 2
 3   EXAMINATION BY:                           PAGE
 4
 5   Mr. O'Kane                                 4
 6   Mr. McPherson                             18
 7
 8         EXHIBITS FOR IDENTIFICATION
 9
10   There were no exhibits marked.
```

Page 4

```
 1   (Stipulation by counsel to administer the oath.)
 2         THE VIDEOGRAPHER:  This is a deposition of
 3   Jesse Kunewa in the matter of Jeannette Miller versus
 4   Maui Ocean Activities, Inc., et al.
 5         We are located at the offices of Ralph
 6   Rosenberg Court Reporters in Kailua-Kona on the Big
 7   Island of Hawaii.  My name is Robert Whitman,
 8   certified legal video specialist.
 9         Will Counsel please state their names?
10         MR. McPHERSON:  Howard McPherson for Jeannette
11   Miller.
12         MR. O'KANE:  And John O'Kane for Maui Ocean
13   Activities and the other defendants.
14         THE VIDEOGRAPHER:  Today is June 26 in the year
15   2006 and we are on the record at 2:42 p.m.
16         Would the court reporter please swear in the
17   deponent?
18              JESSE KUNEWA
19   called as a witness at the instance of the Defendants,
20   being first duly sworn to tell the truth, the whole
21   truth and nothing but the truth, was examined and
22   testified as follows:
23              EXAMINATION
24   BY MR. O'KANE:
25   Q.  Good afternoon, Jesse.  I'm John O'Kane, and we
```

Page 5

```
 1   had some discussions earlier about the fact that in
 2   August of 2003 you worked for Maui Ocean Activities
 3   here in Kona under Aloha Jet Skis; is that correct?
 4   A.  That's correct.
 5   Q.  And you understand that I am the attorney for
 6   Maui Ocean Activities and Aloha Jet Skis?
 7   A.  That's correct.
 8   Q.  And you also understand that for the purposes
 9   of this deposition I'm your attorney, you agree to
10   that?
11   A.  Correct, correct.
12   Q.  You agree to that?
13   A.  Yes.
14   Q.  Jesse, you don't mind if I call you Jesse, do
15   you?
16   A.  No, no, no, no.
17   Q.  Jesse, we're here because of an injury that
18   occurred to Jeanette Miller on August the 26th of
19   2003.
20         Do you remember Jeanette Miller?
21   A.  Yes.  In fact, I was the one that gave her the
22   orientation on the job.
23   Q.  Was that earlier in the month in --
24   A.  It, basically, was -- because I think I went
25   for two, maybe three days, and then, of course, after
```

Page 6

1 that I didn't see her anymore.
2   Q.   Let's go a little bit over your background.
3 Have you ever had a deposition taken before?
4   A.   No, this is the first time.
5   Q.   First time. Let me just give you a couple of
6 comments so you'll understand. The court reporter
7 over here takes down every word we say, and I don't
8 know how she does it, but it comes out at the end in a
9 booklet form, and it will turn around and not only
10 have my questions, it will have your answers. And it
11 will have Mr. McPherson's questions and the answers
12 you give to him.
13      You'll get an opportunity to review that and
14 make sure it's correct, okay, and we'll send you a
15 copy so you can review it.
16   A.   All right.
17   Q.   One of the things you have to do is answer
18 affirmatively either yes or no or give an answer
19 because the court reporter even though we're filming
20 this has a difficult time putting down a head nod,
21 okay?
22   A.   All right.
23   Q.   So if either myself or Mr. McPherson prompts
24 you to say is that a yes or a no, I'd appreciate it if
25 you'd follow-up, okay.

Page 7

1   A.   All right.
2   Q.   The other problems that the court reporter has
3 to keep a clean record is not to talk over each other;
4 in other words, wait until either myself or
5 Mr. McPherson finishes the question and then you can
6 answer.
7   A.   Okay, all right.
8   Q.   Is there anything that -- you said you had a
9 cough. Is there anything that can prevent you from
10 giving your best answers today? In other words, are
11 you on medication --
12   A.   Not at all.
13   Q.   Not at all?
14   A.   Not at all.
15   Q.   Let's talk a little bit about your full name,
16 if you could, Jesse.
17   A.   Do you want me to give it, my full name, too?
18   Q.   Yeah.
19   A.   Just initial or my full name?
20   Q.   No, full name, if you would?
21   A.   Jesse Kamakaila Kunewa.
22   Q.   Where were you born, Jesse?
23   A.   I was born in Kailua-Kona.
24   Q.   What year?
25   A.   1935.

Page 8

1   Q.   What's your present address?
2   A.   74-5162 Haleolono Place at Hawaiian Homelands,
3 above the high school.
4   Q.   How long have you lived there?
5   A.   Going on to five years.
6   Q.   Five years?
7   A.   Yeah.
8   Q.   What's your educational background?
9   A.   I've been in high school and did a couple years
10 in college and then, basically, I was sort of, kind of
11 a vocational worker; and mostly, it was fishing with
12 my dad.
13   Q.   Doing what with your dad?
14   A.   Fishing, commercial fishing.
15   Q.   Fishing?
16   A.   And then charter fishing with a coast guard
17 license.
18   Q.   Where did your dad fish, here in Kailua-Kona?
19   A.   Kailua-Kona.
20   Q.   Where did you go to college?
21   A.   I went to college in Brigham Young University.
22   Q.   Brigham Young?
23   A.   Yeah.
24   Q.   How long did you go there?
25   A.   That was in 65 -- '63, '64, something like

Page 9

1 that.
2   Q.   Did you graduate from Brigham Young?
3   A.   No, I didn't.
4   Q.   How many years did you have there?
5   A.   I had two years there.
6   Q.   What was your course of study?
7   A.   My course of study was music.
8   Q.   Music.
9   A.   And then I had to come home after that.
10   Q.   Do you play instruments?
11   A.   Yes, I do.
12   Q.   What do you play?
13   A.   I play the ukulele and the guitar.
14   Q.   Slack key?
15   A.   I tried to get on it, but not as much as I
16 wanted to.
17   Q.   What is your current employment?
18   A.   My current employment is with the Kona Beach
19 Shack at the King Kamehameha Hotel.
20   Q.   And how long have you been there?
21   A.   I've been there now for three years, and I
22 basically -- two years.
23   Q.   When did you start working for Ted King and
24 Maui Ocean Activities?
25   A.   Well, I think I worked for them for May -- four

Page 10

1  years, December, and I can't remember the year.
2  Q. Were you working this jet ski operation before
3  Maui Ocean Activities bought it?
4  A. Yes, I was.
5  Q. Who were you working for on the old --
6  A. Joe Hendricks.
7  Q. How do you spell his last name?
8  A. H-a-n-d-j-i-s or j-e-i-s.
9  Q. And how long did he run that operation?
10 A. Well, he had it, roughly, for about two years,
11 then he sold it to Ted King.
12 Q. Ted King?
13 A. Uh-huh.
14 Q. And you continued to work for Ted?
15 A. I continued to work for Ted.
16 Q. What were your duties with -- well, let me go
17 back a little bit.
18    Did you work for Maui Ocean Activities or did
19 you work for Aloha Jet Skis or were they the same
20 company?
21 A. Well, I worked for Aloha Jet Ski first, and I
22 was a charter boat captain with a coast guard license.
23 Q. What does your license allow you to do?
24 A. It's a six pack.
25 Q. Six pack license?

Page 11

1  A. Six pack license, and it's good until 2008.
2  Q. 2009?
3  A. 8.
4  Q. 8, so it's still current?
5  A. Yes.
6  Q. Do you remember Jeannette Miller?
7  A. Yes, I do. I vaguely remember her because she
8  had blonde hair and she was not heavy, but she was --
9  and her attitude, it was easy to work with her. She
10 was very nice. She worked very good because she was
11 always asking questions what her job is, and
12 basically, I give it to her.
13 Q. She was a nice girl?
14 A. Uh-huh.
15 Q. Yes?
16 A. Yes.
17 Q. What job was she hired to do with Aloha Jet
18 Skis?
19 A. She was -- her job was to handle the people
20 that came to the trailer and to give them the waivers
21 so they could sign the waivers so that they can go
22 onto the boat; and also, her job also, we had a DVD
23 that showed the dos and the don'ts about the jet skis
24 and that was one of her jobs.
25 Q. Did she also collect money from patrons?

Page 12

1  A. No. We weren't able -- we weren't supposed to
2  collect money on the pier because there is a policy
3  there that is no money that had to be done there. So
4  basically, everything was settled on the trailer --
5  excuse me, on the platform.
6  Q. That was a state policy, State of Hawaii
7  policy?
8  A. Yes, it was.
9  Q. When you say the trailer, what was the trailer?
10 The trailer was a truck, wasn't it?
11 A. We had a truck and we had a trailer and the
12 trailer, we had four skis on it. So we would tow the
13 trailer and then we back it in and the skis came off
14 the trailer.
15 Q. Was her job title as booth attendant?
16 A. Yes, and just doing those two simple things;
17 meet people and talk to people until I took the people
18 from her and put them on the boat to take them out to
19 the trailer -- to the platform, excuse me.
20 Q. You said you worked with her two or three days;
21 is that right?
22 A. Yes.
23 Q. Did you provide her her orientation for the
24 job?
25 A. Basically, yes.

Page 13

1  Q. Could you tell me what the orientation -- what
2  did you tell her and -- let me go back on that.
3     Did you tell her what her job responsibilities
4  were?
5  A. Yes, I did.
6  Q. Can you tell us what you told her on what she
7  was supposed to do?
8  A. I, basically, told her that her job was when
9  the people come up to the truck, you talk to them and
10 you give them the waiver, and as soon as the waiver is
11 done, signed, then I take the waiver from her and she
12 shows them that DVD. And when that's done, then I
13 take the people to the boat and out to the platform.
14 Q. Actually, there was two kind of people, were
15 they not, people that had signed up someplace else
16 prior to -- had appointments, so to speak?
17 A. Right.
18 Q. And there was walk-ups; is that correct?
19 A. Right.
20 Q. Did you describe to her how you handled each
21 one?
22 A. Well, no, because they're, basically, the same.
23 Anybody that comes over there gets a waiver and a DVD
24 and then we take them out on the boat.
25 Q. Did Ms. Miller have any duties aboard the

Page 14

1  shuttle boat at all?
2  A. None at all. In fact, none at all that I know
3  of because I didn't see her do anything she wasn't
4  supposed to do.
5  Q. Her job is a booth attendant; is that correct?
6  A. Right.
7  MR. McPHERSON: I'm sorry, I couldn't hear the
8  last answer.
9  THE WITNESS: Oh, I'm sorry. No, I didn't take
10  her out to the platform and she didn't perform any
11  duties on the boat while I was captain.
12  BY MR. O'KANE:
13  Q. During her orientation did you bring her out to
14  the platform and show her what the platform --
15  A. No, I didn't, because that was not her job.
16  Q. Did Ms. Miller's job have anything to do with
17  loading cargo or anything on the vessel?
18  A. Well, no, didn't have anything to do with her.
19  Q. Did she have anything to do with assisting
20  people to get onto the vessel?
21  A. Not when I was working.
22  Q. Did she have anything to do with untying or
23  tying up the vessel?
24  A. Not at all.
25  Q. Let's describe the Aloha Jet Ski operation, if

Page 15

1  you can for me. Tell me what they do.
2  A. Well, like I say, we have walk-ups and we have
3  people that make arrangements and they fill the job,
4  begin the day. They call in, we call in for
5  reservations and we give them, so we wait for the
6  reservations. And then we take walk-ups, when we can,
7  and then they come to the truck and we sign them up
8  and we give them the waiver, they sign the waiver.
9  Now, from the beginning we didn't have the DVD,
10  but when Ted came and bought the business, then we had
11  the DVD. And basically, they come and as soon as they
12  sign the waiver, and I take the waiver and take them
13  on the boat, on the shuttle boat. And then I take
14  them out to the platform and then give the waivers to
15  instructor out there and then he takes over the job of
16  telling them the dos and don'ts on the jet ski.
17  Q. Is it fair to describe that as a tourist
18  recreational activity?
19  MR. McPHERSON: Excuse me, hold on a second,
20  Mr. Kunewa. It's vague and ambiguous. Go ahead.
21  A. I've been working with people for a long time,
22  and of course in an operation like that because I am a
23  captain on the boat, basically, at that time I work
24  with people and it's always tourists-related
25  situation, but we also have the kamaainas, too.

Page 16

1  BY MR. O'KANE:
2  Q. But that was a recreational activity; was it
3  not?
4  MR. McPHERSON: Same objections.
5  A. Yes, it was.
6  BY MR. O'KANE:
7  Q. During the time she worked with you, did you
8  ever see her get in the vessel and go out to the
9  platform?
10  A. No.
11  Q. Did she ever, during the time she worked with
12  you, help passengers on and off the shuttle vessel?
13  A. Not that I remember.
14  Q. Did you require assistance --
15  A. No.
16  Q. -- let me just finish the question if I could.
17  A. I'm sorry.
18  Q. There has been some prior testimony that you
19  had a knee injury, we know that's true; is that true?
20  A. Right.
21  Q. Did you have trouble at any time getting in and
22  out of the boat while you had your knee problem?
23  A. Well, it's all over. There wasn't any problem
24  with me anymore. I didn't have any problem getting on
25  the boat because I was -- I've been on the boat for so

Page 17

1  long it's kind of like second nature to me.
2  Q. Were you able to assist passengers get on the
3  vessel?
4  A. Yes. Most of the time I'm on the boat and I'm
5  bringing the people on the boat.
6  Q. Did you ever require assistance with the
7  passengers getting on the boat?
8  A. Well, sometimes when it's rough, up and down,
9  we always have people that helps us, helping on the
10  boat, especially if it's low or high tide.
11  Q. Do you recall during the time you worked with
12  Jeannette Miller, if she ever helped you?
13  A. No, I don't recall that.
14  Q. Did Ms. Miller have any repair duties for the
15  vessel or the platform?
16  MR. McPHERSON: It's compound.
17  A. No, I can't even imagine her doing that.
18  BY MR. O'KANE:
19  Q. Let me recognize Mr. McPherson's objection.
20  A. No.
21  Q. Did Ms. Miller ever have any repair
22  responsibilities for the vessel you operated?
23  A. No.
24  Q. Did Ms. Miller have any repair responsibilities
25  for the platform?

Page 18

1    MR. McPHERSON: Foundation.
2    A. No, no.
3    BY MR. O'KANE:
4    Q. Did she have any repair responsibilities for
5    any of the jet skis?
6    MR. McPHERSON: Foundation.
7    A. Not at all.
8    MR. McPHERSON: Mr. Kunewa, excuse me for
9    interrupting, but it would be very helpful if you give
10   just a moment before you answer.
11   THE WITNESS: My first time and I get a little
12   nervous. I'm 71 years old.
13   MR. McPHERSON: No problem.
14   THE WITNESS: Thanks.
15   MR. O'KANE: I'm closing in on you, Jesse.
16   That's all I have.
17                EXAMINATION
18   BY MR. McPHERSON:
19   Q. Mr. Kunewa, I'm Howard McPherson. I'm Jeanette
20   Miller's attorney for the case. Good afternoon.
21   A. I think I recognize you from someplace, but
22   it's not in a case like this. Nevertheless, anyway.
23   Q. I'm from the Big Island but a long time ago,
24   Mr. Kunewa.
25   Do you recall ever speaking to me before this

Page 19

1    afternoon?
2    A. No, I don't. If it was -- well, no, I don't
3    remember that, no.
4    Q. Did Mr. O'Kane become your attorney just this
5    afternoon?
6    A. Excuse me?
7    Q. Did Mr. O'Kane become your attorney just this
8    afternoon before this deposition began?
9    A. I'm a little hard of hearing, too.
10   Q. When did Mr. O'Kane become your attorney, just
11   today?
12   A. Yes.
13   Q. Just before we started today?
14   A. He asked me if I wanted to be his [sic]
15   attorney and I said yes.
16   Q. You're not paying him, are you?
17   A. No, I'm not.
18   Q. Any particular reason why you wanted him to be
19   your attorney?
20   A. Because, I guess, basically, because he's
21   working for my company, I guess.
22   Q. Are you still working for Ted King?
23   A. No, I'm not, I'm not.
24   Q. But you still have some friendship with the
25   company; is that correct?

Page 20

1    A. Oh, yes, I do.
2    Q. The knee injury that you had in 2003, do you
3    recall testifying about that just a minute ago?
4    A. Yes, I do.
5    Q. You had a leg injury, in other words, correct?
6    A. It was my knee, knee injury.
7    Q. Knee injury. How did you injure your knee at
8    that time?
9    A. It wasn't on the boat. As a matter of fact,
10   that knee has been giving me trouble for a long time
11   and then I went to see the doctor and he said I need
12   to take an operation because the knee was going out on
13   me.
14   Q. Is that your right knee; is that correct?
15   A. Yes, yes.
16   Q. Did you have an operation on your right knee?
17   A. Yes.
18   Q. Do you recall when you had that operation?
19   A. That was about two years ago.
20   Q. So sometime in 2004 about?
21   A. Right.
22   Q. When did you first see the doctor about your
23   knee in talking about this operation?
24   A. Maybe six months before that.
25   Q. So sometime in late 2003 or early --

Page 21

1    A. Uh-huh, correct.
2    Q. So you were still having a knee problem in
3    August of 2003?
4    A. Yes, I was, but it wasn't -- I was having a
5    knee problem, right.
6    Q. Did you hire Jeanette Miller yourself?
7    A. No, I did not.
8    Q. Do you know who did?
9    A. I think she was hired by Ted King.
10   Q. What makes you say that?
11   A. Because, in fact, I was sure of that because he
12   came in previous to talk to a few girls. And then he
13   told me that he had one girl come in and work for her
14   and she me gave his name -- I mean her name and then
15   she came. He usually does most of the hiring,
16   especially the employees.
17   Q. Did he hire you?
18   A. Yes, he did; yes, he did, I'm sorry.
19   Q. Did he tell you he hired Jeannette then?
20   A. Yes, he did. I'm sure of that now.
21   Q. Did he tell you what her job was going to be?
22   A. Well, he asked me to give her a job description
23   and I knew what the job was going to be before she
24   came because we were looking for people for that
25   particular position.

Page 22

1  Q. The booth attendant position?
2  A. Right.
3  Q. Did he talk to you about telling her what her
4  job was going to be?
5  A. Yes, he did, he did.
6  Q. What did he say?
7  A. He told me what she has to do, what we hired
8  her to do, and that was it.
9  Q. Was she not supposed to go on the boats at all?
10 Let me withdraw the question and let me ask you
11 differently. I'm sorry.
12     Was she forbidden from going on the boats?
13 A. No.
14 Q. Was she forbidden from going on the platform?
15 A. No, she wasn't.
16 Q. Was she forbidden from helping the guys with
17 the boats?
18 A. I have to ask you on that question because when
19 I work -- when I'm working, we have two guys, the
20 instructor and myself, and we handle the main
21 equipment. So I told her or most of the people that
22 come for the job, to do that particular job, that
23 that's not their job to do.
24 Q. But I'm asking was she forbidden from helping?
25 A. No, no, she wasn't; no, she wasn't at all.

Page 23

1  Q. The two, three days that you worked with
2  Jeanette, who was the instructor?
3  A. Oh, his name was Pat. I can't remember his
4  last name.
5  Q. Patrick Shand?
6  A. Yeah.
7  Q. Was he the only instructor during those two,
8  three days that you worked with Jeanette?
9  A. No, had another fellow named Mike and I can't
10 remember his last name.
11 Q. Haole guy?
12 A. Haole guy.
13 Q. How old, about?
14 A. Maybe 24, 25 or maybe younger than that. Pat
15 was 19 and he worked with me for a long time.
16 Q. Patrick was 19?
17 A. Yeah.
18 Q. Jeanette was a very good worker for the
19 company?
20 A. Yes, she was when she was working for me, yes.
21 Q. As far as you know, an honest person?
22 A. She was always a nice person to me.
23 Q. As far as you know, honest person?
24 A. As far as I know, yeah.
25 Q. Nice, young woman?

Page 24

1  A. Yes.
2  Q. Were the instructions that you talked about
3  with Mr. O'Kane or the orientation that you gave to
4  Jeanette, was that all of it, was that all of the job
5  orientation you gave her?
6  A. Yes.
7  Q. Meeting the customers, showing them the DVD,
8  giving them the waivers, that was her complete job?
9  A. Right.
10 Q. So you didn't give her any instruction on
11 anything else?
12 A. Nothing, I didn't give instruction on anything
13 else.
14 Q. Jeanette has testified in this case in her own
15 deposition that she recalls going on the boat with
16 you. Does that refresh your recollection at all?
17 A. No, not at all.
18 Q. Did you keep logs, Captain Kunewa, for your
19 daily work on the boat?
20 A. Basically, I do.
21 Q. What did the log look like? Was it in a book?
22 A. It's mostly in little books and then on the
23 job, but my job was already detailed for me, so I
24 didn't keep logs for that, for that particular job.
25 Q. The book you kept was your book?

Page 25

1  A. Right.
2  Q. Do you still have it?
3  A. No, I don't.
4  Q. Did the company -- did you keep any log for the
5  company about what you did with the boat?
6  A. No, because that was not one of our
7  requirements.
8      MR. McPHERSON: No further questions.
9      THE WITNESS: Thank you.
10     MR. O'KANE: That's all I have.
11     THE VIDEOGRAPHER: The time is now 3:07 p.m.
12 We're going off the record and that concludes the
13 deposition.

Page 26

1  I, JESSE KUNEWA, hereby certify that I have
2  read the foregoing typewritten pages 1 through 25,
3  inclusive, and corrections, if any, were noted by me,
4  and the same is now a true and correct transcript of
5  my testimony.
6    DATED: Kailua-Kona, Hawaii_____
7
8
9  _____
10
11   JESSE KUNEWA
12
13
14
15
16 Signed before me this _____
17 day of _____ 2006.
18
19
20 _____
21
22
23 Miller vs. Maui Ocean Activities; Civil No. 04-00441
24 BMK; Deposition taken on 6/26/06 by Deborah A. Ng,
25 RPR, CSR 336.

Page 27

1  STATE OF HAWAII       )
   COUNTY OF HAWAII      )
2
3    I, DEBORAH A. NG, RPR, CSR 336, State of
4  Hawaii, hereby certify:
5    That on June 26, 2006, at 2:42 p.m. appeared
6  before me JESSE KUNEWA, the witness whose deposition
7  is contained herein;
8    That prior to being examined, the witness was
9  by me duly sworn;
10   That the deposition was taken by me in machine
11 shorthand and was thereafter reduced to typewriting by
12 me;
13   That the foregoing represents, to the best of
14 my ability, a full, true and correct transcript of
15 said deposition.
16   I further certify that I am not attorney for
17 any of the parties hereto, nor in any way concerned
18 with the cause.
19   Dated: Kailua-Kona, Hawaii, July 5, 2006.
20
21    _____
      DEBORAH A. NG, CSR 336
      Registered Professional Reporter
22
23
24
25